Dan DURAN, et al., Plaintiffs-Appellees,

v.

Richard ELROD, et al.,
Defendants-Appellants.

No. 83–1574.

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1983.

Decided July 22, 1983.

Rehearing and Rehearing En Banc
Denied Oct. 6, 1983.

Henry A. Hauser, Asst. State's Atty., Chicago, Ill., for defendants-appellants.

Richard Jay Hess, Sally T. Elson, Robert E. Lehrer, Phillip H. Snelling, Legal Asst. Foundation of Chicago, Chicago, Ill., for plaintiffs-appellees.

Before WOOD and CUDAHY, Circuit Judges, and GRANT, Senior District Judge.*

GRANT, Senior District Judge.

The Plaintiffs-Appellees are a certified class consisting of all pretrial detainees in the custody of the Cook County Department of Corrections. The Defendants-Appellants are Richard J. Elrod, the Sheriff of Cook County, Phillip T. Hardiman, the Executive Director of the Cook County Department of Corrections, the Cook County Board of Commissioners and its members in their official capacities and the Cook County Board of Corrections and its members in their official capacities (hereinafter "County officials" or "County defendants"). The plaintiff detainees filed this class action in 1974, pursuant to 42 U.S.C. § 1983. The detainees charged the defendant County officials with violations of their rights under the Eighth and Fourteenth Amendments to the United States Constitution by failing to provide safe and humane conditions of confinement. After extensive discovery and negotiations between the parties, a comprehensive Consent Decree was entered by the district court on April 9, 1982. This Decree called for the renovation and modernization of the county jail facilities; increasing of staff personnel; improvement in food services and provision of personal hygiene supplies; increased access to the law library; more physical exercise periods and increased hours for visitation. As part of the Consent Decree, the parties agreed that the John Howard Association (hereinafter "Monitor") should be appointed by the district court to review and evaluate the implementation of the Decree at set time intervals. The district court retained jurisdiction over the case in order to enforce as necessary the Decree. This case is presently before this Court on expedited appeal from a subsequent district court order.

On October 9, 1982, the John Howard Association submitted their first six month report regarding jail conditions. The Monitor found that the goals outlined in the Consent Decree had not been achieved. The Monitor reported that, by the second week of June 1982, among inmates assigned to Division II, 375 were not assigned a bed. The report continued that by September 27, 1982 the population in Division II had reached 1,285 men with 436 sleeping on the floor, a large number without mattresses or blankets. R. 15, Ex. B, p. 4. In Division V, 370 men were sleeping on the dayroom floors, many again without mattresses or blankets. In October 1982 in the Women's Division (Division III) from 15 to 50 women were sleeping on mattresses on cell floors. The Monitor reported that one of the contributory factors to the jail population was the retention of low-bond inmates for longer periods because of inability to raise a relatively small amount of bail. The report indicated that from 500 to 750 inmates could be released "if they had only $100." *Id.* at p. 5. As a result of the Monitor's report, the detainees filed a Petition for a Rule to Show Cause why the County defendants should not be held in contempt for violating the Consent Decree. That petition was granted.

Hearings were held, and on January 25, 1983, the district court ordered a "cap" on the population of Department of Corrections at 4500 inmates. This figure was arrived at to assure that each inmate would have a bed. The defendants were directed to file with the court by February 11, 1983 a report detailing (a) the method chosen to reduce the inmate population and (b) the results achieved in the reduction of the population. R. 19, p. 3.

On February 11, 1983, the defendant County officials filed a status report, including the Director's Log from January 21 to February 8, 1983, which indicated that on February 8, 1983 the jail population was 4,830 with 4,583 beds available. At the same time, the defendants filed a Motion for Relief from the population "cap" ordered on January 25, 1983 and a Motion for modification of the Consent Decree requesting double-bunking in Division I. At a March 2, 1983 status hearing, Judge Shadur

---

* The Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, sitting by designation.

called for the parties to submit criteria for the release of inmates in order to reach the "cap." The plaintiffs suggested on March 4, 1983 the use of the same criteria used by Judge Lasker in the New York case, *Benjamin v. Malcolm,* No. 75 C 3073 (S.D.N.Y. filed June 23, 1981), i.e., release on their own recognizance those persons in default of the lowest amount of bail, and among those held on an equal amount of bail, the ones who had been confined the longest. R. 27. The defendants failed to submit a criteria, contending that release of inmates was beyond their legal authority. R. 26, p. 2. On March 21, 1983, the district court's Minute entry denying the defendants' Motion to Modify the Consent Decree was docketed. The following day, March 22, 1983, the district court entered the Opinion and Order subject of this appeal. Judge Shadur held:

> This Court therefore orders (as did Judge Lasker) [*Benjamin v. Malcolm, supra*] that if compliance with the Order requires a reduction in inmate population at the D of C at any time after April 15, 1983 and if no Illinois state court of competent jurisdiction has then specified a different method of selecting the persons to be released to accomplish such reduction, Sheriff Elrod and Director Hardiman are directed to release on their own recognizance the persons held in default of the lowest amount of bail, and among persons held on the same amount of bail the ones who have been confined for the longest time. This order leaves the primary and direct responsibility with the state court judiciary, where both the litigants and this Court agree it belongs.
>
> This order also confirms the denial of defendants' motion for double celling of Division I at the D of C. That would represent a step backward from the salutary provisions to which defendants agreed when they co-authored the Decree.

R. 31.

The County defendants immediately appealed from that March 22 Memorandum Opinion and Order docketed March 29, 1983.

R. 32. A stay of the district court Order was granted by this Court on April 15, 1983.

Upon appeal, the following issues were raised:

1. Whether the district court incorrectly denied the County officials' Rule 60(b) Motion to modify the Consent Decree to permit double-bunking in Division I;

2. Whether the district court in its March 22, 1983 Opinion and Order exceeded its authority in directing the release of low-bond pretrial detainees.

## I.

### Motion to Modify Consent Decree

It must initially be noted that the detainees argue that this Court is without jurisdiction to review this issue as the Notice of Appeal failed to designate an appeal from the February 11 Order denying modification of the Decree. The Minute entry was dated February 11, 1983, the date the County officials filed their Motion to modify, but the entry was *not docketed* until March 21, 1983. The March 22, 1983 Opinion and Order stated in conclusion "[t]his order also confirms the denial of defendants' motion for double celling of Division I at the D of C."

Fed.R.App.P. 4(a)(1) provides:

(a) ·Appeals in Civil cases.

(1) In a civil case in which an appeal is permitted by law as of right from a district court to a court of appeals the notice of appeal required by Rule 3 shall be filed with the clerk of the district court within 30 days after the *date of entry* of the judgment or order appealed from; ...

(emphasis added). The date of entry has been defined as occurring:

> ... when the essentials of a judgment or order are set forth in a written document separate from the court's opinion or memorandum and when the substance of this separate document is reflected in an appropriate notation on the docket sheet assigned to the action in the district court. This dual requirement is established by Civil Rule 58, Entry of Judgment, which states that "[e]very judg-

ment shall be set forth on a separate document" and that "[a] judgment is effective only when so set forth and when entered as provided in Rule 79(a)." Rule 4(a), which is derived without change in substance from a former civil rule, incorporates both of these standards.

*Caperton v. Beatrice Pocahontas Coal Co.,* 585 F.2d 683, 688 (4th Cir.1978) (footnotes omitted).

In this instance, the date of entry of the initial denial of the Motion to modify was March 21, 1983. This was confirmed by the Order of March 22, 1983. The notice of appeal was filed March 30, 1983.

■ The requirements of Fed.R.App.P. 3(c) that a notice of appeal "shall designate the judgment, order or part thereof appealed from . . ." have been given liberal interpretation by federal appellate courts. It is unmistakable that the defendants intended to appeal both the opinion ordering release of low-bond detainees to meet the "cap" and the denial of the modification requested. Both issues were addressed in the Opinion, a final appealable order. The release order became necessary when the request for modification was denied.

> The rule is now well settled that a mistake in designating the judgment, or in designating the part appealed from if only a part is designated should not result in loss of the appeal as long as the intent to appeal from a specific judgment can be fairly inferred from the notice and the appellee is not misled by the mistake.

9 Moore's Federal Practice ¶ 203.18, p. 3–76–77 (1983) (footnotes omitted).

As the Supreme Court pointed out in *Foman v. Davis,* 371 U.S. 178, 181–2, 83 S.Ct. 227, 229–30, 9 L.Ed.2d 222 (1962):

> It is too late in the day and entirely contrary to the spirit of the Federal Rules

of Civil Procedure for decisions on the merits to be avoided on the basis of such mere technicalities. "The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson,* 355 U.S. 41, 48 [78 S.Ct. 99, 103, 2 L.Ed.2d 80]. The Rules themselves provide that they are to be construed "to secure the just, speedy, and inexpensive determination of every action." Rule 1.

Under the facts of this case, there was no prejudice to the appellees as both parties argued the merits of the issues on appeal. *See Hennessy v. Schmidt,* 583 F.2d 302, 306 (7th Cir.1978). We will consider both issues on appeal.

The County officials contend that their request for an emergency double-bunking modification of the Consent Decree was precipitated by the unforeseen and substantial increase in admissions to the jail facilities in 1982.[1] They contend that the temporary change in the Decree is necessary in order to cope with the unforeseen emergency population growth. Defendant Phillip T. Hardiman indicated in his affidavit (R. 26, Ex. D) that short-term double-bunking in Division I will permit taking individuals off the floors in Division V, and that double-bunking would not affect the reasonable conditions of the division.

The County officials argue that they have made a good faith effort to meet the goals set in the Consent Decree. They contend their Rule 60(b) motion is clearly less intrusive to federalism than the release of individuals, confined under the state court system, on their own recognizance pursuant to the guidelines of the March 22 Order. The

---

1. Beginning in June of 1982, the Cook County Department of Corrections began to experience population levels which were in excess of design capacity and one hundred to two hundred inmates over the average number of operable cells (bed space) available to the Department. By early fall, the number of inmates housed in the Cook County Department of Corrections on an average day had climbed to between five hundred and six hundred above its conventional operating capacity of 4,500 inmates. By October and November of 1982, the average daily population levels in the Cook County Department of Corrections were fluctuating between seven hundred and eight hundred inmates above the jail's capacity. Report of The National Institute of Corrections, pp. 1–2 (January 31, 1983), R. 22, Ex. 3.

County officials argue that their modification proposal is especially appropriate because the County has already approved the construction of a new 500 bed modular jail facility.[2]

■ Rule 60(b) is an extraordinary remedy requiring "a showing of exceptional circumstances or grievous wrong evoked by the new unforeseen condition." *DeFilippis v. United States,* 567 F.2d 341, 342 (7th Cir.1977). As District Judge Lasker held earlier in *Benjamin v. Malcolm,* 528 F.Supp. 925, 928 (S.D.N.Y.1981), modification under Rule 60(b) requires "that a significant change of circumstance shall have occurred since the date of the final judgment to warrant its modification." Justice Cardozo held in *United States v. Swift & Co.,* 286 U.S. 106, 119, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1931):

> There is need to keep in mind steadily the limits of inquiry proper to the case before us. We are not framing a decree. We are asking ourselves whether anything has happened that will justify us now in changing a decree. The *injunction,* whether right or wrong, *is not subject to impeachment in its application to the conditions that existed at its making.* We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes to the grocery business as it has to every other. The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. *Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what*

*was decreed after years of litigation with the consent of all concerned.*

(Emphasis added).

■ As the detainees pointed out in brief and at oral argument to this Court, the County officials have failed to show any unforeseen or unexpected condition since the entry of the Decree. The County facilities were crowded at the time of the Decree and have remained so since. *See Benjamin v. Malcolm,* 528 F.Supp. at 929. The Third Circuit, when considering the modification of a consent decree to allow the emergency confinement of Pennsylvania inmates for a maximum of 48 hours in a basement facility required the showing of exceptional circumstances and extreme hardship unless the relief was granted. *Mayberry v. Maroney,* 558 F.2d 1159, 1163 (3d Cir.1977). *See also McGoff v. Rapone,* 78 F.R.D. 8, 24 (E.D.Pa. 1978). We do here also.

In the case at hand, the County officials have requested a modification of the Decree to allow double-bunking (an additional 627 beds) in Division I. Such a modification would allow approximately 250–300 inmates to be assigned beds.

This Court weighed these figures and legitimate concerns with the National Institute of Correction's projection of inmate population "in excess of 6,000 by early 1984 unless changes in policy and practices alter the current trends." R. 21, Ex. 3, p. iii. While the population of the County facilities has been slowly decreasing from the November 1983 high (the downward trend notable since the January 25, 1983 imposition of a population "cap"), the modification of the cell occupancy in Division 1, the delay in the construction of the new facility and the expectation of at least normal inflation of inmate population attacks the integrity of the Consent Decree. The County officials made a free, deliberate choice when it agreed to settle this dispute and terminate the long costly litigation.

---

**2.** It should be noted that the County defendants first began to speak of a proposed new 500 bed facility in mid-February 1983 indicating a six to eight month completion date. As of June 6, 1983 when oral arguments were heard on this case not one spade of ground has been turned.

Counsel, in answer to a question regarding construction, reported that approval had been obtained but a bond issue was necessary, soil samples had to be taken and final plans drawn up. In other words, the start of construction is sometime down the road.

The parties engaged in arms-length bargaining and the detainees have a justified expectation that the bargain freely entered will be honored. As the detainees have pointed out, remedial measures regarding the jail population were not implemented until after the petition for a Rule to Show Cause was filed.

This Court finds that the County Defendants have failed to show an unforeseen and substantial change in circumstances since the entry of the bargained for Consent Decree nor an extreme hardship if their proposed remedy is not granted. The district court did not abuse its discretion in denying the County defendants' Rule 60(b) motion to modify. *DeFilippis v. United States,* 567 F.2d at 343; *Ben Sager Chemicals International, Inc. v. E. Targosz & Co.,* 560 F.2d 805, 809 (7th Cir.1977); *Beshear v. Weinzapfel,* 474 F.2d 127, 130–31 (7th Cir.1973).

## II.

### *March 22 Release Order*

The County defendants contend that they have carefully shaped a remedy for the overcrowding conditions through the proposed new construction and limited emergency double-bunking. They submit that they have submitted a reasonable constitutional remedy which directly addresses the issue of overcrowding and does not interfere with decisions of the state court system. The County officials argue that the district court's release order is an unwarranted intrusion into the County's authority.

The issue before this Court is whether the district court's choice of remedies for the overcrowded conditions and enforcement of the Consent Decree was an abuse of its discretion. As the Supreme Court held in *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973) when "shaping equity decrees, the trial court is vested with broad discretionary power; appellate review is correspondingly narrow." *See also United States v. City of Chicago,* 631 F.2d 469 (7th Cir.1980). An abuse of discretion occurs when "no reasonable person could take the view adopted by the trial court. If reasonable persons could differ, no abuse of discretion can be found." *Harrington v. DeVito,* 656 F.2d 264, 269 (7th Cir.1981), *cert. denied,* 455 U.S. 993, 102 S.Ct. 1621, 71 L.Ed.2d 854 (1982).

The March 22 Opinion and Order clearly indicated that the district court was aware of, and sensitive to, the need to strike a proper balance between the integrity of the Consent Decree and the principles of federalism. R. 31, p. 2. The implementation of a population ceiling was recommended by the Monitor. The figure of 4500 reached after hearings and recommendations by counsel reflected the capacity of the facility, minus a numerical factor as a buffer for repairs, etc. The district court, when it set the "cap," clearly left to the appropriate state and county agencies the determination of the means to reach the population "cap." While the appropriate agencies in early 1983 began to consider remedial measures, it was Judge Shadur's determination that "the problem will not go away and that a means must be selected to assure effective compliance with the ceiling set by the Order." *Id.* at p. 4. (The district court had previously set a date of February 11, 1983 but that date had been postponed pending the recommendations of the parties). These appropriate agencies have failed to come up with a proposal within the principles of the Decree.

The Release Order called for the reduction of the inmate population through the release, on their own recognizance, of low-bond pretrial detainees as necessary to reach the "cap." These releases would occur after April 15, 1983 "if no Illinois state court of competent jurisdiction has then specified a different method of selecting." *Id.* at p. 5. As Judge Shadur pointed out, the March 22 Order placed the primary and direct responsibility on the state court judiciary to meet the problems in the prisons and begin corrective methods. *Id.* The district court fashioned a remedy placing the responsibility for the jail on the appropriate parties and not in the federal court.

It should be noted that the persons eligible for possible release on their own recognizance are low-bond pretrial detainees. These individuals have not been convicted of the crime for which they are being detained, but are in the preliminary stages of a criminal proceeding and are unable to make bail. Low-bond detainees ($500 or less) averaged over 800 inmates in the County facilities from August-November 1982. R. 22, Ex. 3, p. 8. These detainees represented 60% of the increase in the jail population in 1982. *Id.* In November 1982, approximately 200 jail inmates required bonds of less than $100 and another 200 required bonds up to $200. Plaintiffs' Sur-Reply filed December 13, 1982, Ex. B, Appellants' Appendix, p. A–145. Thus, the possible beneficiaries of the Release Order are not convicts nor are they subject to serious state bail requirements.

■ The district court, when it entered the March 22 Opinion and Order was confronted with a nearly year-old Consent Decree and substantial noncompliance with that Decree by the County defendants. These officials had been invited to develop a workable remedy and their only suggestion was to modify the bargained-for Consent Decree. The district court did not act precipitously but rather acted fairly and reasonably to ease a critical problem. As Judge Shadur pointed out in his Opinion, State and County agencies must address this problem.

> From a longer range point of view, the Cook County Board has just authorized construction of supplemental facilities with a capacity of housing 500 inmates—a step that can be taken much more expeditiously than a more ambitious building project. That too is a means that should have been addressed before the situation reached its current crisis proportions, but once in place it will obviously ease (though not solve) the situation. This entire matter of overcrowding needs constant monitoring to prevent recurrence, and one of the real dangers of a "solution" that involves simply increasing the number of available spaces is that it might create a tendency for the various responsible state agencies to ease up and let the problem get out of hand again—not intentionally, but because the matter might no longer be viewed as a pressing immediate need. Unfortunately correctional institution population tends to operate somewhat like the law of physics in which a gas always expands to fill the available space.

R. 31, p. 4 n. 5.

This Court is under the impression that the County defendants are attempting to avoid compliance with the Consent Decree by rewriting the terms which they have difficulty meeting. It was reasonable for the district court to enter what it considered the best remedy to the overcrowding in the County jail facilities.

### Conclusion

This Court affirms the Opinion and Order of the district court of March 22, 1983 and revokes the Stay of that Order granted April 15, 1983 by this Court. This case is remanded to the district court for supervision of the March 22, 1983 Order and the underlying Consent Decree. This Court awards attorney's fees and costs to the appellees.