Carlos **MORALES FELICIANO**, et al., Plaintiffs,

v.

Rafael **HERNANDEZ COLON**, et al., Defendants.

Civ. A. No. 79–4 (PG).

United States District Court, D. Puerto Rico.

Sept. 14, 1987.

See also, 672 F.Supp. 591.

Harvey B. Nachman, Santurce, P.R., for plaintiffs.

Marcos Ramírez-Lavandero, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

Pending before the Court is the defendants' Motion to Modify the Stipulation on Crowding. That pleading in fact seeks modification of the order of this Court, dated January 26, 1987, approving and adopting as an order of the Court, a stipulation of the parties, filed September 8, 1986. The defendants' motion seeks relief under Rule 60(b) of the Federal Rules of Civil Procedure, specifically under subsections (5) and (6).

Section I of the order will discuss the background of the present motion. Section II will discuss the standards applicable to motions to modify injunctions. Section III will evaluate defendants' modification request in light of the applicable standards.

## I. BACKGROUND

Since the inception of this litigation, over eight years ago, the issue of crowding in the penal institutions of Puerto Rico has been pervasive. The Court's first substantive decree, issued on September 5, 1980, addressed this issue by directing defendants to provide each person in the custody of the Administration of Correction with at least 35 square feet of living space.[1] Five and a half years after that decree, the Court entered its Memorandum Opinion and Order, finding fundamental constitutional violations in the operation of the Puerto Rican prison system. At the heart

---

1. Critically, this minimum mandate was a *temporary* measure designed to provide inmates immediately with a modicum of decency in their habitations while incarcerated. The September 5 order requires, ultimately, that inmates housed in cells be provided with at least 70 square feet of living space and that inmates in dormitories be afforded at least 55 square feet of living space. Plans to accomplish these graduated objectives were to be filed with the Court within 90 days of the order. *Feliciano v. Barceló,* 497 F.Supp. 14 (D.P.R.1980).

of that finding was the problem of crowding. The simple staggering numbers of inmates, crowded in facilities already sorely taxed by age and neglect, create a core of constitutional deprivation, from which radiate related problems of deplorable hygiene, rampant violence, disregarded illness, pervasive idleness and arbitrary discipline. The Memorandum Opinion and Order of March 23, 1986, revisited the issue of crowding in light of evidence made known to the Court by a variety of means set out in the opinion. The Court was dismayed to learn how little had been done to ameliorate the crowded conditions that had been condemned a half-decade earlier; indeed, the numbers of inmates, housed typically in the same aging facilities, had grown greatly, far outstripping the modest new construction and renovation undertaken in the intervening time. That this situation was intolerable, and would not be tolerated by the Court, could not have escaped the attention of defendants after issuance of the March 23 order.

At the time of that order, the Court appointed two monitors to assist in evaluating the conditions in the prisons of Puerto Rico, and to participate in the development of a comprehensive remedial plan to alleviate unconstitutional conditions. The first formal act of the monitors, undertaken with the Court's express approval, was to convene negotiations designed to address the fundamental problem of crowding in the penal facilities of Puerto Rico.[2] Those negotiations consumed a considerable period of time, as they required, among other things, the compilation of accurate information about the size of housing units in all of the institutions, a process that proved to be difficult and protracted.

On September 8, 1986, over six years after the Court's initial decree on living space, the parties signed a stipulation on the crowding issue. The stipulation establishes population limits for each penal institution in Puerto Rico, and also requires that inmates be provided a minimum amount of living space. The provision of living space for inmates is to be accomplished in a phased manner; the only standard in the stipulation at issue in the pending motion is the requirement that as of December 31, 1986, defendants provide a minimum of 35 square feet of personal living space for inmates.[3]

The Stipulation was provisionally approved by the Court on September 26, 1986, and finally approved by an order filed on January 26, 1987, after appropriate proceedings pursuant to Rule 23 of the Federal Rules of Civil Procedure. The Court's order approving the stipulation directed that it be implemented immediately, thereby transforming the stipulation into an order of this Court, with full binding effect on the parties.

On February 27, 1987, the monitors filed their *Second Report*, evaluating defendants' state of compliance with the provisions of the Court's order on crowding. The report reflected the state of affairs in Puerto Rico's prisons as of January 26–30, 1987. The report was approved, and its findings adopted, by the Court on March 27, 1987, without objection by any party. In brief, the report documented significant noncompliance with the substantive provisions of the stipulation on crowding, including institutional populations in excess of those permitted by the stipulation, and maldistribution of population within institutions, combining to deprive individuals housed in certain housing units of the 35 square feet of living space to which they are entitled under the terms of the Stipulation.

After the *Second Report of the Monitors* was filed, plaintiffs filed a Motion for Contempt. The motion alleged fundamen-

---

**2.** At the time of these negotiations plaintiffs' motion seeking a finding of contempt against defendants, alleging violations of the Court's September 4, 1980, order on crowding, was pending before the Court. As part of the stipulation plaintiffs agreed to withdraw that motion.

**3.** Of course, to the extent defendants seek a nine-month extension of the time at which they are required to provide 35 square feet of living space per inmate, extension of the subsequent deadline for provision of 55 square feet seems inevitable although the matter is not addressed in the current motion.

tal and pervasive noncompliance with the terms of the stipulation, beginning with its first effective date and continuing until the date of filing of the motion. Plaintiffs' motion sought a finding of contempt and the imposition of civil sanctions.

The Court convened a hearing on the plaintiffs' motion on May 27, 1987, at which testimony was adduced relating to the facts of compliance, and the circumstances surrounding development and implementation of the stipulation.[4] On July 23, 1987, the Court issued its Opinion and Order adjudicating plaintiffs' motion for contempt. The Opinion and Order first reviewed the procedural background of the contempt proceeding and summarized the evidence presented at the hearing. After these preliminary matters, Findings of Fact and Conclusions of Law were set forth, supporting the judgment of the Court that defendants were in contempt of the Court's order on crowding. As a consequence of that judgment, and in order to promote future compliance with the Court's orders, a sanction in the amount of $50,000 was imposed; further, a prospective daily sanction of $10 per inmate was imposed, to be paid whenever the terms of the stipulation concerning maximum institutional capacity or individual living space are violated.

The July 23 order was not appealed from. Rather, after plaintiffs' motion for contempt was adjudicated, defendants had been found in contempt, and a sanction had been imposed, defendants moved for relief from the underlying obligation to provide 35 square feet of living space for inmates housed in the penal institutions of Puerto Rico.[5] The facts alleged in defendants' brief in support of their motion for relief

essentially summarize the testimony of Dra. Otero de Ramos, the Administrator of Correction, which was the primary evidence offered by the defendants during the May hearing in defense of the charge of contempt.[6]

## II. STANDARDS FOR MODIFICATION

Rule 60(b) of Federal Rules of Civil Procedure governs the modification of decrees and relief from judgment. Rule 60(b) provides, in pertinent part, as follows:

On Motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons:

(5) it is no longer equitable that the judgment have prospective application;

(6) any other reason justifying relief from the operation of the judgment.

Defendants' motion apparently seeks relief under both subsections of the rule. At the outset, then, the rule should be analyzed to determine the standard to be applied to defendants' motion.

### A. *Modification Generally*

Modification of an injunctive decree is extraordinary relief, and parties seeking such relief have a formidable burden in establishing that equitable concerns warrant modification. *United States Steel Corp. v. Fraternal Association of Steel Haulers*, 601 F.2d 1269, 1274 (3rd Cir. 1979); *V.T.A. v. Airco*, 597 F.2d 220, 224 (10th Cir.1979). It is, of course, proper that modification should be exceptional rather than routine, as any attempt to alter the terms of a binding injunctive decree implicates the elemental concerns of finali-

---

**4.** The testimony adduced at the hearing is described in detail in the Court's Opinion and Order of July 23, 1987, and need not be recounted here.

**5.** The present case thus is far different from that reviewed in *Newman v. Graddick,* 740 F.2d 1513 (11th Cir.1984), where the court held that a district court, faced with simultaneous motions for contempt and modification, should resolve the modification issues before assessing defendants' compliance with, and possible contempt of, the decree.

**6.** Indeed, the factual matters alleged in defendants' motion all relate to developments that occurred before the May hearing, and therefore, are addressed in the evidentiary record of that hearing, making the compilation of additional evidence unnecessary. In fact, defendants have not sought an evidentiary hearing for their motion. The Court has concluded, therefore, that it can resolve the pending motion without an evidentiary hearing. A certain number of the findings of fact made by the Court in its July 23 order are directly material and will be noted; additional findings will be made herein.

ty, the legitimate expectations of the parties and the preservation of judicial resources. As expressed by the United States Supreme Court, "firmness and stability must no doubt be attributed to continuing injunctive relief based on adjudicated facts and laws and neither the plaintiff nor the court should be subjected to the unnecessary burden of reestablishing what has once been decided." *System Federation No. 91 v. Wright*, 364 U.S. 642, 647, 81 S.Ct. 368, 371, 5 L.Ed.2d 349 (1961). This concern is no less valid when the injunction in question was entered by consent, since it is beyond question that consent decrees are judicial acts, as well as contracts, and are entitled to the same finality and deference as orders entered following constested litigation. *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932). "There must be an end to litigation some day, and free, calculated and deliberate choices are not to be relieved from." *Ackerman v. United States*, 340 U.S. 193, 198, 71 S.Ct. 209, 211, 95 L.Ed. 207 (1950).

Of course, the present case presents an interesting hybrid of these issues since the obligation to provide 35 square feet of living space per inmate is, within this litigation, derived from both an injunction following a hearing (the September 1980 order) [7] and an order adopting an agreed decree (the September 1986 stipulation and order). In any event, the relief sought by defendants is extraordinary, and the showing they must make to obtain the relief is imposing.

### B. *Subsection (5)*

Subsection (5) of Rule 60(b) embodies the long-standing common law doctrine that permits modification of equitable decrees when three requirements are met: [8]

a) the decree has been in place for a considerable period of time;

b) compliance has been achieved and maintained for long enough to diminish the threat of further dereliction; and

c) prospective application of the decree would work an injustice. This three-prong test embodies the fundamental rule governing modification of consent decrees that was announced a half-century ago by the United States Supreme Court. In *United States v. Swift & Company*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), the Court reviewed a lower court's refusal to modify a consent judgment, several years after its entry and, it is worth noting, after defendants had established a course of compliance. The basic claim of defendants in *Swift* was that the decree should be modified to account for intervening changes in the market structure. Because of the controlling nature of the *Swift* standard as it relates to subsection (5), the opinion will be discussed at some length.

First, the Court observed the historic power of an equity court to modify its orders:

> We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent.... A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.

286 U.S. at 114, 52 S.Ct. at 462. After acknowledging the possibility that some decrees might of necessity be provisional, in that they involve changing conduct and conditions, the court enunciated the standard that should be applied on the facts before it. Two formulations are set out, and they are essentially the same:

> a) [a] court must not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changed circumstances into an instrument of wrong;

*Id.* at 115, 52 S.Ct. at 462; and, in a lengthier and more revealing passage,

> b) [t]he injury for us is whether the changes are so important that dangers, once substantial, have become atenuated to a shadow. No doubt the

---

**7.** No appeal was taken from this judgment.

**8.** Rule 60(b) codified the common law doctrines relating to modification of, and relief from, judgments.

defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying they are the victim of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.

*Id.* at 119, 52 S.Ct. at 464.[9] *See, Fortin v. Commissioner of Mass. Dept. of Public Welfare,* 692 F.2d 790, 799 (1st Cir.1982).

■ In summary, then, it may be said that subsection (5) relates to situations in which a party seeks to modify a decree, after a sustained course of compliance, on the ground that changed circumstances make further application for the decree unjust. Reduced to those terms, it is apparent that defendants are not in a position to seek relief under subsection (5). The decree has, as yet, had *no* application, in that it has never been complied with. Moreover, nothing has changed since entry of the decree to make its application unjust, or to transform it into "an instrument of wrong." The requirement that defendants provide 35 square feet of living space for inmates remains just, to say the least, and prospective application of the decree is fitting and proper. Any changes in circumstance averred by defendants relate only to their misapprehension of facts extant at the time the stipulation was assigned. That situation is not cognizable as changed circumstances within the meaning of *Swift.*

### C. *Subsection (6)*

Thus, if at all, defendants are entitled to seek modification under subsection (6). As a practical matter, the content of subsection (6) must be construed as a residual exception, embodying any historic equitable ground for modification not otherwise specified in the specific grounds set out in subsection (1) through (5).

Although because of its facts *Swift* is predominantly a case iluminating the common law origin of subsection (5), the Supreme Court's opinion observes that equitable relief might be entered in cases of markedly different character. The Court defined the distinction as being

between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative.

*Id.* The effect of this distinction on the standard to be applied in the event modification is sought is not set out in the *Swift* opinion. It has been articulated, however, by courts of appeals, in reviewing requests for modification of complex and organic injunctions such as those involved in institutional litigation.

These requests arise in factual contexts different from that present in *Swift* in two primary respects. First, rather than a prolonged course of compliance, defendants seek modification at a time of significant noncompliance; second, rather than asserting that prospective application is unjust by virtue of changed conditions, defendants suggest that the decree, if applied, will not accomplish the objective sought. The latter contention is essential in seeking modification of injunctions, in light of the clear doctrine that "a decree may not be changed in the interests of defendants if the pur-

9. The final intonation of the holding—the consensual nature of the judgment—was a notable part of the Court's entire opinion. For example, in response to the argument that market dislocations had arisen since entry of the consent decree that was the subject of the modification motion, the Court noted

The difficulty of ferreting out these evils and repressing them when discovered supplies an additional reason why we should leave the defendants where we find them, especially since the place where we find them is the one where they agreed to be. 286 U.S. at 119, 52 S.Ct. at 464.

The rationale applies at least as strongly to the present case, where the defendants have been under the primary obligation concerning provision of adequate living space for six years. The difficulty of projecting rates of growth in an inmate population provides a powerful reason for not allowing the obligation of defendants to provide minimally adequate habitation to shift with the prevailing prediction.

poses of the litigation have not been fully achieved." *United States v. United Shoe Machinery Corp.*, 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968).

The leading discussions of the standard to be applied in the "provisional" setting envisioned in *Swift* are *Duran v. Elrod*, 713 F.2d 292 (7th Cir.1983) and *New York State Association v. Carey*, 706 F.2d 956 (2nd Cir.1981); *see also, Mayberry v. Maroney*, 558 F.2d 1159 (3rd Cir.1977). Ultimately, the decisions evaluating requests for modification in institutional reform litigation place heavy reliance on the "changed circumstances" and "grievous wrong" language of *Swift*. Nonetheless, because of the difference in underlying facts, the cases merit discussion apart from the basic holding in *Swift*.

Particularly instructive here is the decision in *Duran v. Elrod*, where the Court of Appeals reviewed, and affirmed, a district court's refusal to modify the provisions of a consent decree relating to crowding at a detention facility. The defendants sought modification on the ground that unexpected population increases had complicated the task of complying with the crowding provisions they had agreed to.

The court noted first the "extraordinary" nature of rule 60(b) relief, and the requirement that "a significant change of circumstance shall have occurred since the date of the final judgment to warrant its modification." 713 F.2d at 296, *quoting, Benjamin v. Malcolm*, 528 F.Supp. 925, 928 (S.D.N.Y. 1981).[10] Defendants failed to make this showing, even though they were able to establish unforeseen population increases. The court concluded

[t]the County officials made a free, deliberate choice when it [sic] agreed to settle this dispute and terminate the long costly litigation. The parties engaged in arms-length bargaining and the detainees have a justified expectation that the bargain freely entered will be honored.

*Id.* at 296–97.

In *New York State Association v. Carey (Willowbrook)*, 706 F.2d 956 (2nd Cir.1981), defendants sought to modify an order relating to the depopulation of an unconstitutional mental health facility. The court's order originally limited the size of alternative facilities that could be used to house inmates released from Willowbrook. Defendants' motion conceded the validity of the underlying objective—depopulation of Willowbrook—and argued that the injunction in fact hindered accomplishment of the objective by limiting the use of alternative facilities. Thus, at issue was only the matter of how best to accomplish depopulation. In this context, the court noted that the particular demands of institutional reform litigation, and the dynamic character of the reform project, require that modification be granted "with a rather freer hand." *Id.* at 970. Yet, the greater freedom of modification in this situation serves only the end of perfecting or improving the mandated route to the underlying objective. As the court in *Carey* noted, changes should be viewed more freely, provided the change "would not derogate from the primary objective of the decree." 706 F.2d at 969.[11]

### D. Conclusion

The analysis set out above yields the following principles:

---

**10.** The opinion in *Duran v. Elrod* traces this standard to the "grievous wrong" language in *Swift*. This lineage establishes that parties seeking modification must show a significant change in circumstances, warranting modification, whether the decree at issue is entered in a fixed or an organic context as those situations are delineated in the *Swift* opinion.

**11.** In *Fortin v. Commissioner of Mass. Dept. of Public Welfare*, 692 F.2d 790 (1st Cir.1982), the Court of Appeals for the First Circuit affirmed a denial of defendants' motion to modify, which motion was based on an alleged "change of law" since entry of the consent decree. After review-

ing the facts and rejecting the claim of "change of law" the court assessed the line of cases that permit modification under the more flexible standard applicable to supervision of changing conduct. As summarized by the *Fortin* court, "the rationale of these cases is that when the relevant facts turn out to be different than supposed at the start, the decree may be altered to produce the originally intended result." 692 F.2d at 800. In *Fortin*, the defendants were unable to make that showing, and so modification was denied, even under the more flexible standard.

1) defendants bear the burden of establishing that they are entitled to modification;

2) to meet this burden, defendants must demonstrate that, by virtue of changed circumstances, the decree as written will not accomplish the underlying objectives;

3) defendants must show, as well, that the changes sought will not detract from the basic objective, here the provision of minimally adequate living space for inmates.

Defendants' request to modify the Court's order on crowding will be reviewed in light of these standards.[12]

## III. DEFENDANTS' REQUEST FOR MODIFICATION

The considerations advanced in support of their claim for relief are denominated by defendants, in the sub-headings of their motion, as "unforeseen population increase", "substantial compliance", "1987 construction program" and "consequences". The foregoing analysis of the standards for modification should make it apparent that "substantial compliance" and the scope of the current construction program are not generally cognizable as grounds for modification. Therefore, primary attention will be addressed to two following separate but related issues: (1) changed circumstances relating to the rate of increase in the inmate population; and (2) the potential adverse consequences that might arise from compliance with the mandate as written. Following that discussion, the extent of compliance and the scope of the efforts thus far to comply will be addressed.

Defendants offer factual assertions to support the claim of changed circumstances, and those assertions warrant discussion. The second ground, relating to consequences, can be discussed simply and will not require a detailed review of the evidence; accordingly, it will be discussed first.

### A. *Consequences*

■ The core of the argument concerning pernicious consequences is that if defendants are required strictly to comply with the terms of the stipulation, they will be forced to loose on the community large numbers of prisoners not qualified for such release, thereby endangering the community and hindering the Commonwealth's attempt to curb crime. With regard to the latter point, defendants suggest that considerations of comity and commonwealth/federal relations are implicated.

First, the factual basis for this position is dubious. It relies on the assertion that all persons presently incarcerated in Puerto Rico would present a danger to the community if released. That assertion is confuted by the testimony of Dra. Otero that the Correction Administration has insufficient halfway houses and other alternatives to confinement to handle inmates eligible for such assignments or diversion.

Second, the argument has an undertone of disingenuity, since defendants have known for six years that they are obligated to provide minimally adequate living space for inmates, and have, throughout, been delinquent in doing so. Now, having been punished, for the first time, for not meeting their obligations, they invoke the spectre of release of inmates. Of course, the civil contempt remedy imposed in this case is not a directive for release, such as that reviewed in *Newman v. Graddick*, 740 F.2d 1513 (11th Cir.1984). Indeed, the rem-

---

**12.** Impossibility is also a basis for modification. In other words, if the terms of an injunction are impossible to meet, defendants are entitled to have the decree modified. The claim of impossibility in this context is one of *permanent* impossibility, and thus, is far different from a claim of *temporal* impossibility alleging that a particular deadline cannot be met. Such a claim is not a basis for modification although it may serve as a defense to contempt. In other words, if defendants suggest that the December date for provision of 35 square feet was impossible to achieve because of temporal miscalculation, that argument might stand as a defense to contempt. In the current case, of course, evidence on that point has been received and carefully considered, and it was rejected as a defense in the present case. Even were such a defense of temporal impossibility established, however, it would still not warrant modification of the decree.

edy here is the precisely approved remedy, one that permits defendants to choose their fate: either comply, or be sanctioned—the option remains with defendants, as does the choice of means of achieving compliance. Defendants' recalcitrance has brought them to the point where, in the short run, release of inmates appears to be the only means of compliance. Had they not ignored other means of controlling the operation of the criminal justice system and the rate of incarceration, their options would have been more bountiful.

Finally, as for the effect of compliance on the sovereignty of the Commonwealth and the integrity of federalist relations, there must be no confusion as to the nature of the obligation in this case. Nothing in this Court's actions interferes with the efforts of the Commonwealth as to the enforcement of the criminal laws of Puerto Rico, or any other policy decision of that entity. The Commonwealth is being required to do only one thing in this action: adhere to the mandates of the United States Constitution. In the event internal policy decisions lead to the incarceration of individuals in institutions operated by the Commonwealth, the conditions of confinement must meet constitutional standards. The application of this principle of constitutional government to Puerto Rico scarcely interferes with the prerogatives of the Commonwealth.[13]

### B. *Changed Circumstances*

█ The more forceful argument advanced in support of defendants' motion for modification is that the circumstances extant at the time the stipulation was agreed to and entered as an order have changed. Defendants' factual allegations

in support of this claim essentially condense the testimony of Dra. Otero during the May contempt hearing. Importantly, however, certain critical elements of that testimony are not set forth in defendants' brief. The salient points of Dra. Otero's testimony, as it relates to the changed circumstances advanced by defendants, are the following:

1. When Dra. Otero assumed the responsibilities of the position of Administrator of Correction, she knew that the problem of crowding in the institutions was the central issue to be addressed, and she began immediately to address it by developing plans for reduction of the population and expansion of available housing facilities. At least one of these plans was submitted to the Governor, urging immediate attention to the priority of crowding.

2. Dra. Otero was aware, early in her administration, that the internal planning efforts of the Administration had been adversely affected by inaccurate population projections.

3. The Administration of Correction commissioned a study of the correctional system in Puerto Rico, to be conducted by Multi Search, Inc. the report resulting from that study, usually referred to as the "Vargas Report" after the chief author, was completed in April 1986. The report predicted that the annual growth rate for the inmate population over the five-year period at the end of this decade would be 2.75%.[14]

4. Aware of past inaccuracies in population prediction, and concerned about the apparent illogic of the estimate contained in the Vargas Report, the Administration of Correction revised the predicted growth upward to 9.1%.[15] It is important to note

---

**13.** Moreover, although the Court's order is the product of federal constitutional considerations, it is worth noting that the current conditions of confinement violate commonwealth law as well. These laws are a forceful index of the values of Puerto Rico and suggest that in applying the requirements of the federal constitution to the operation of commonwealth institutions, the Court is not traducing on the prerogatives of the sovereign.

**14.** The Vagas Report was introduced into the record of this litigation pursuant to a motion of plaintiffs, to which defendants did not object.

**15.** Indeed, Dra. Otero testified that she was aware, in fall 1985, that the rate of growth far exceeded the 2.75% figure advanced in the Vargas Report. As a simple example of the unreasonable nature of the Vargas predictions, the report predicted a total inmate population for 1990 of 6,352, a growth of only 600 inmates from April 1986, notwithstanding the fact that

that the basis for this estimate is not in evidence, although Dra. Otero apparently attributed the projection to the Planning and Development Division of the Correction Administration.

5. It is apparent, however, that Dra. Otero did not have confidence in the accuracy of the 9.1% projection, which is understandable in view of the haphazard nature of the projection and the legacy of inaccuracy that has surrounded the effort to project the penal population in Puerto Rico.[16] While Dra. Otero was working on the population projections that informed the stipulation, she was developing contingency plans in the event the actual rate of growth in the inmate population exceeded the 9.1% figure.

6. In September 1986 the Stipulation was signed. Dra. Otero was aware at that time that the population was growing at more than 11% per year. Moreover, even a cursory review of the available data concerning population increases in 1986 discloses that from January 1, 1986, to September 1986 the inmate population had grown by 600 inmates, an annual rate of 17.34%.[17]

7. By the end of December 1986, Dra. Otero knew that the actual rate of growth in the inmate population was on the order of 17% per annum.

This body of testimony does not establish changed circumstances. Indeed, it is striking that the circumstances that existed, in fact, at the time the stipulation was entered into are essentially the same as those that obtain now. At most, defendants' claim is that they misapprehended the facts at the time of their agreement. The evidence does not even support this claim, as it appears that the 9.1% figure either did not, or should not have, controlled the projections upon which defendants' agreement to the stipulation was based. In any event

it is clear that defendants should have known that the population projection figure on which they relied was, in all probability, inaccurate.

Moreover, even if defendants misunderstood the underlying facts relevant to population projections, and did not properly assess the information available at that time, they certainly knew by the end of 1986 that they had drastically underestimated the actual rate of growth. Yet, they did not make a motion for relief from the stipulation, did not informally apprise the Court of the predictable problems in compliance, did not solicit the assistance of the monitor and did not seek discussions with plaintiffs' counsel. Indeed, nothing was done to seek relief from the obligation when plaintiffs filed their motion for contempt. Only when the Court issued its order of July 23, finding defendants in contempt and imposing sanctions, did they seek to change the order. This sort of brinksmanship does not speak well for the defendants' claim that their good faith efforts to comply were derailed by unanticipated problems in the growth rate, which necessitate the filing of the motion to modify.

One must be mindful of the content in which the stipulation was signed. In summer 1986, a contempt motion was pending alleging that defendants had failed, from the start, to comply with the September 1980 order concerning provision of 35 square feet of living space per inmate. The fact of noncompliance at that time is beyond question although ultimately the issue of contempt was never adjudicated. Thus, defendants faced the real possibility of contempt sanctions at the time the stipulation was signed. The four-month grace period from September to December was the product or negotiation and conscious choice by the parties, and certainly the

---

in the six months immediately preceding issuance of the report the population had grown by approximately 350 inmates.

**16.** It is noteworthy that in projecting population in the late 1980s, allowance had to be made for the uncharted impact of determinate sentencing in Puerto Rico. The record does not reflect

whether such allowance in fact was made. Inadequate assessment of that factor, alone, would substantially skew any projection.

**17.** This figure is derived by taking the increase in inmate population for the first eight months of 1986 (from 5432 to 6060) and projecting that rate of increase for an entire year.

December implementation date for the 35 square foot standard was not the product solely of defendants' internal calculations, however erratic or unreliable. "The parties engaged in arms-length bargaining and the detainees have a justified expectation that the bargain freely entered will be honored." *Duran v. Elrod,* 713 F.2d at 297.

Finally, even if changed circumstances were present, defendants have provided no support for the proposition that, by virtue of these changed circumstances, they should be relieved from the requirement of providing inmates with 35 square feet of living space. The underlying rights of inmates remain fully accrued, yet denied, and will until defendants take their obligations under the order seriously, and fulfill them. Had defendants established at the contempt hearing that all reasonable efforts to achieve compliance had been made—a showing they were unable to make—they might have availed themselves of a defense to a finding of contempt. That defense, however, is wholly separate from a claim that the underlying obligations should be altered, particularly when to do so would postpone further the vindication of the rights of the plaintiff class.

### C. *Other Asserted Grounds for Modification*

 In addition to the basic grounds of consequences and changed circumstances, defendants urge on the court consideration of the scope of the 1987 building project and the degree to which that project has accomplished compliance with the goals of the crowding stipulation. Neither of these matters, even if established, warrants modification of the injunction. Sincere, thorough and effective efforts to comply with court orders are nothing more than what the law expects. The attempt to transform those efforts into relief from the underlying duty is unseemly. Indeed, the efforts made by defendants to comply with the injunction are more in the manner of defenses to contempt, and they were given plenary consideration as such by the Court in its adjudication of contempt. Those efforts will be considered here as grounds of modification to demonstrate that, even if

relevant to modification, the facts do not support defendants' claim of diligence in attempting to comply.

The Court is aware, in great detail, of the building project undertaken by the Correction Administration in 1987 to increase dramatically the available beds for housing inmates. These efforts are hartening, and they suggest, it may be hoped, that the protracted course of inaction and dereliction that so long troubled this litigation may be at an end. Yet, building alone is not sufficient to constitute the form of resolute purpose and steadfast endeavor that shields a party from contempt, let alone provide a basis for relief from judgment.

The conditions of crowding in a penal system are the product of more than a shortage of beds, and there is reason to believe that active efforts by defendants on all fronts will be fruitful. Finding of Fact number 8 in the July 23 opinion found that "no coordinated efforts have been made by the Commonwealth to control the flow of prisoners into or out of existing facilities." That finding is beyond challenge, and defendants do not attempt to suggest it is erroneous. Dra. Otero testified forcefully about her views of the desirability of increased numbers of half-way houses and alternatives to incarcerations. Yet, defendants have not even suggested, much less established, that efforts to pursue such alternatives have been made. The contract for transfer of inmates to the Federal Bureau of Prisons remained unfulfilled at the time of the hearing despite its important role in assisting the Administration in ameliorating crowding and its attendant problems. Defendants have undertaken no efforts to arrange for temporary housing as an interim solution to crowding of institutions. The process by which the amount of bail is set by judicial officers and the possibilities for expediting the posting of bonds to secure inmate releases, have not been the subject of intensive scrutiny and reasoned evaluation. There appears to have

been no systematic assessment of sentencing practices in the Commonwealth.[18]

The Court is not required to suggest to defendants the routes they should pursue to further their efforts to depopulate; yet the listing of these essentially rudimentary matters suggests the extent to which defendants have fallen short of establishing that they have taken "all reasonable measures to exercise diligence, effective control and steadfast purpose, achieving the prescribed goals." *Aspira of New York v. Bd. of Education,* 423 F.Supp. 647, 651 (S.D.N.Y.1976). That gap cannot be bridged solely by the construction of new and renovated housing space.

To be sure, the construction has greatly increased the number of inmates housed in Puerto Rico who are afforded at least 35 square feet. Defendants' assertions in this regard are skewed by misconception, however, and when analyzed fall far short of establishing a basis for modification, even temporarily, of the order.

When a housing unit is overcrowded every inmate in that unit suffers deprivation of the rights guaranteed by the Court's order in that none of the inmates have the 35 square feet to which they are entitled.[19] This fact should not be diminished, yet defendants' contention seems to take little note of it.

Moreover, serious compliance problems exist at several institutions, including the State Penitentiary, the largest institution in Puerto Rico; Ponce, one of the most dilapidated; Vega Alta, where all female inmates are housed; and Aguadilla, an old and structurally obsolete institution. Taken together, these institutions house approximately one third of the members of the plaintiff class. The Court is unwilling to barter the rights of prisoners assigned to the overcrowded prisons against those fortunate enough to be housed elsewhere and conclude that, on balance, all is well. The crowding order guarantees rights to every member of the plaintiff class, wherever housed, and it applies to every prison in Puerto Rico. The accomplishment of depopulation at some institutions is commendable, but the effort must be systemic in order to be effective, and its effects must be systemwide.

To the extent defendants have been conscientious in pursuing compliance, and have achieved it at some institutions, that fact is recognized by the connection between the prospective fine and the actual extent of noncompliance. To permit defendants to modify the underlying order, however, because they have attempted to obey the law and have had some success recently in doing so would exhibit disregard of settled legal principles and of the rights of inmates that are the subject of this litigation.

Projections of inmate population may be perilous. These perils aside, adherence to the long settled obligation concerning the provision of living space for inmates in Puerto Rican correctional institutions must not be postponed further. "A decree may not be changed in the interests of defendant if the purposes of the litigation have not been fully achieved." *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968). In the end, indifference to law and nonchalance in obedience to duty is pernicious, in its direct consequences on the

---

**18.** The operation of the entire criminal justice system in Puerto Rico unquestionably is a prime element in the combination of circumstances that creates crowding in the penal institutions. That system has not been subjected to intensive scrutiny to ensure it operates appropriately in all its particulars in light of the limited incarceration resources available on the Island. Such an evaluation plainly is mandated by the pervasive crowding. In this regard it is worth noting that the Governor of the Commonwealth is a named defendant in this action.

**19.** The prospective sanction imposed in the July 23 order applies only to each inmate housed over the number that may be housed consistent with the provision of 35 square feet. This matter was clarified in a recent order. Plaintiffs have argued that, since every inmate in a crowded dormitory is deprived of his right to 35 square feet, the per capita fine should apply to each inmate so housed. This argument is entirely logical, and has considerable force. For now, the Court will stand by the position announced in its order of August 14, 1987. Should crowding continue to plague the institutions, the sanction might be adjusted to account for every inmate housed without minimally adequate living space.

victims of neglect, and in its indirect effect on the quality of life in a society devoted to the rule of law. The order of the court approving the stipulation on crowding and adopting it as an order of the Court will not be modified.

IT IS SO ORDERED.