Carlos **MORALES FELICIANO**, et al., Plaintiffs,

v.

Rafael **HERNANDEZ COLON**, et al., Defendants.

**Civ. No. 79–4(PG).**

United States District Court, D. Puerto Rico.

Jan. 10, 1991.

Nachman & Fernandez Sein, Santurce, P.R., McConnell, Valdes, San Juan, P.R., Carlos Ramos Gonzalez, Santurce, P.R., Jose A. Fernandez Paoli, Miramar, Santurce, P.R., Carlos Garcia Gutierrez, Gonzalez Badillo & Davila, Harry Anduze, Pia Gallegos, Hato Rey, P.R., Jeffrey Williams, San Juan, P.R., for plaintiffs.

Ramirez & Ramirez, Hato Rey, P.R., Pedro Del Valle, Federal Lit. Div., Dept. of Justice, San Juan, P.R., for defendants.

## MEMORANDUM OPINION AND ORDER DENYING MODIFICATION AND IMPOSING SANCTIONS FOR CONTEMPT

PEREZ–GIMENEZ, Chief Judge.

### I. *Introduction*

Once again the Court is called upon to consider a request by defendants to modify a stipulation entered into on September 8, 1986, and approved by the Court on January 26, 1987. This order is based upon testimony and documentary evidence submitted during hearings commenced on October 22, 1990. These hearings constituted a continuation of hearings commenced on May 3, 1990, which resulted in an Opinion and Order, entered on June 7, 1990, denying defendants' motion to modify the stipulation and postponing consideration of plaintiffs' June 9, 1989, motion seeking imposition of contempt sanctions. At the conclusion of its June 7 order, the Court directed defendants to file a comprehensive compliance plan, the identity of which was first disclosed during the May hearings, ordered the parties to enter into good faith negotiations regarding the adequacy of that plan, and set additional hearings to begin on October 1, 1990, in the event that the parties could not agree upon the terms of the comprehensive plan.[1]

Defendants' compliance plan was to have been filed on July 7, 1990. On July 9, however, defendants sought an extension until August 7. Plaintiffs objected and defendants were ordered to file their plan no later than July 20. Defendants complied with this order.

Negotiations over the plan quickly broke down when defendants refused plaintiffs' request that "someone with direct access to the Governor and with the authority to bind him to agreement reached during negotiations" participate in any negotiations and that the Governor agree in advance to be a signatory to a final agreement if such an agreement were to be reached.[2] Defendants then requested that the plan be referred to the Court Monitor for review, to be followed by recommendations to the Court. Following a status conference held on September 14, 1990, the Court entered its September 19, 1990, order in which it found that plaintiffs' requests were reasonable conditions to meaningful negotiation. The Court specifically found that "plaintiffs have fulfilled their obligations under the June 7 order to enter into good faith negotiations regarding the plan."[3] Hearings were scheduled to commence on plaintiffs' contempt motion on October 22, 1990, at which time defendants were invited to introduce additional evidence in support of their motion to defer compliance with the 55 square foot standard until June 1991.

On October 4, 1990, defendants filed their Motion Seeking Modification of Stipulation Regarding the 55 Sq. Ft. Standard Due to Emergency Temporary Housing Project. Although scant on details, defendants' pleading concludes as follows:

> To summarize, defendants seek a modification of the stipulation regarding the 55 sq. ft. standard in order to defer compliance on the basis of an Emergency Temporary Housing Project intended to meet the 55 sq. ft. standard system-wide.

On the same date, plaintiffs renewed their motion for civil contempt, seeking fines for past violations of the 55 square foot standard at $125 per prisoner per day as well as fines of $125 per prisoner per day for future violations of that standard. Plaintiffs ask that fines for past violations be

---

**1.** Even in the absence of agreement regarding the plan, the Court indicated that the defendants' plan could be a basis for modification of existing orders if the plan were to be found satisfactory to bring about timely compliance with its orders and with the mandates of the United States Constitution and to implement the purposes of the Court's orders. All of this was announced to be contingent upon the plan's

containing sufficient guarantees of timely and complete execution. June 7, 1990, Order, note 15, at p. 20.

**2.** Plaintiffs' Motion for Leave to Commence Discovery Immediately, August 20, 1990, pp. 2–3.

**3.** September 19, 1990, Order, p. 4.

placed in a special fund to be used to alleviate the institutional effects of overcrowding (*e.g.*, recreational facilities, equipment, and staff) and that any monies remaining in this fund when defendants achieve compliance be returned to them as an incentive for speedy compliance.

Hearings commenced on October 22, 1990. The first day of these hearings, however, was devoted to a motion for a temporary restraining order filed by plaintiffs on the morning of that day. Plaintiffs' motion alleged egregious conditions at Bayamón 1072, an institution used partially for housing pre-trial detainees. Among plaintiffs' allegations were extreme overcrowding and maldistribution of prisoners in various housing units,[4] the housing of prisoners in desperate need of medical or psychiatric attention that was not being provided, the near total absence of water, insufficient food, and the absence of sheets, clothing, eating utensils, and personal hygiene supplies.[5] At approximately 10:30 a.m., the Court conducted a tour of buildings 3, 5, and 7 of the facility in the company of counsel, representatives of the Administration of Correction (hereinafter referred to as the "AOC") and the Department of Health, and others.

The tour disclosed that conditions at Bayamón 1072 were at least as bad as those described in the affidavit of plaintiffs' expert, Steve Martin, a copy of which affidavit was attached to plaintiffs' motion for a temporary restraining order. Prisoners on the second floor were found to be completely without water. Functioning toilets, showers, and lavatories were non-existent. On some occasions, some prisoners miss at least one daily meal, and prisoners who receive food are required to eat with makeshift eating utensils or with their hands. Prisoners were found sleeping on floors, both in dormitories and in shower areas, without mattresses, sheets, or pillows. The Court observed apparently seriously mentally ill inmates and later reviewed the mental health records of eight of these prisoners. That review confirmed the Court's impression. All classes of prisoners, sentenced, pretrial, youth, and adult were mixed in dormitories. Plaintiffs' allegations regarding crowding and extreme maldistribution of prisoners among housing units were confirmed.

Most troubling to the Court was the fact that many of the most egregious conditions observed during the tour of Bayamón 1072 existed as of December 1989 and were described in the 96th Report of the Court Monitor, filed on January 10, 1990. The superintendent of the institution testified that conditions essentially were unchanged since September 4, 1990, when he assumed his position there. He acknowledged that the water "problem" predated his arrival.

At one point during the hearing, the following exchange took place between the Court and Mr. Charles Montgomery, the Deputy Director for Operations of the AOC:

Q. One last question, Sir, coming back to what this hearing is all about, you saw Bayamón today, and you read a report in January 1st that there were those problems there, and that those problems had existed for ten months, is that a true statement?

A. That's true.

Q. And according to your statement just previous, rather than overcrowding you would look at other—that the situation at Bayamón presents other more serious problems concerning the imminent harm to inmates' health and safety?

A. That's correct.

Q. So, in your understanding of the situation at Bayamón 1072, rather than the overcrowding problem there, the problem of the psychotics there, lack of cleanliness, the health problem created by lack of water, by odors, toilets being without water, and all the human feces in there, those are much more serious problems

---

**4.** Plaintiffs alleged a population of 2,082, which is 434 in excess of the institution's capacity of 1,648. Plaintiffs further alleged that 580 prisoners were housed in Building 7, which has a maximum capacity of 256.

**5.** Plaintiffs' Motion for a Temporary Restraining Order, filed October 22, 1990.

that need emergency attention right now?

A. That's correct.

Q. So, you won't be surprised if I acted in that fashion with this request.

A. I would hope that you would.

At the conclusion of the hearing, the Court issued a bench order granting plaintiffs a temporary injunction which, *inter alia,* halted all admissions to Bayamón 1072 until the population at that facility had been reduced to the maximum capacity at 55 square feet and until running water was available in all areas of the institution to permit toilets, lavatories, and showers to function properly and to provide drinking water to all prisoners. A written order to this effect was entered on October 23, 1990.[6]

Although conditions at Bayamón 1072 are not the issue directly before the Court at this time, the conditions found to exist at that institution provide a context in which to assess defendants' pending motion to modify and plaintiffs' motion for imposition of contempt sanctions. Although witnesses testified, and the Court fervently hopes, that conditions at Bayamón 1072 are not reflective of those at all AOC institutions at this time, the conditions observed at Bayamón 1072 indicate at the least that the Court is addressing at this time more than an isolated problem of crowding. To the contrary, crowding continues to exacerbate dreadfully inadequate environmental conditions, absence of medical and psychiatric health care, impermissible mingling of sentenced and unsentenced prisoners, as well as impermissible mingling of adult and youthful offenders, grossly inadequate security, and numerous other problems—all of which, in combination, continue to deprive prisoners in AOC facilities of their minimal constitutional rights.

Hearings on defendants' motion to modify and plaintiffs' motion for contempt sanctions were held on October 23–24. After a recess, the continued testimony of the Administrator of Correction was completed on November 1, 1990. Defendants began by introducing evidence in support of their

6. Preliminary Injunction, October 23, 1990.

motion for modification; plaintiffs then presented evidence in support of their motion for contempt sanctions.

## II. *Findings of Fact Concerning Defendants' Motion to Modify*

■ At the outset, it is noteworthy that defendants have abandoned their comprehensive compliance plan as a basis for modification. Although that plan was filed pursuant to the Court's June 7, 1990, order, it was not introduced into evidence during the course of the October hearings. Defendants offered no testimony that implementation of the plan would correct the wide range of constitutional deficiencies throughout the AOC, nor did they claim that it supports modification.

Moreover, defendants introduced no evidence of changed circumstances, in law or in fact, that would support modification of an injunctive order. They rely exclusively on their stated intention to implement an "emergency temporary housing project" by June 30, 1991, and they seek delay in enforcement of the 1986 stipulation until that project has been completed.

Defendants apparently have concluded that the only viable alternative to reduce overcrowding in Puerto Rico's penal system is the construction of new spaces (Tr. II. 10, 15). This is true in spite of compelling testimony by Mr. Steve Martin, plaintiffs' corrections expert, that no penal system that has fallen behind the building curve has been able to eliminate crowding by construction alone (Tr. III. 119) and that other viable options exist to address this problem (Tr. III. 137–38). Defendants are entitled to opt for new construction, however, and it is on this basis that they offer their emergency temporary housing plan.

The plan involves the construction of 1,000 dormitory spaces for minimum custody prisoners, consisting of 400 beds at Sabana Hoyos, 200 beds at Punta Lima, and 400 beds at Zarzal (Tr. II. 85, 105–06). The buildings will be constructed of concrete floors, concrete block walls, and roofs of steel (Tr. II. 84). They are designed to

have detached hygiene facilities (likened by the Director of the Public Buildings Authority to "modern day outhouses") and are expected to have a life expectancy of 10 years (Tr. II. 104–05). The units are expected to be available by June 30, 1991 (Tr. IV. 7).

Mr. Rafael Arias, the Director of Puerto Rico's Public Buildings Authority, was first informed on September 25, 1990, of the need to complete this construction by June 30, 1991. Prior to September 25, he had never heard the topic mentioned (Tr. II. 87, 90–91). When asked by the Court whether the emergency temporary housing could have been commenced two years ago, this witness responded, "Yes, your Honor, but it was not done that way" (Tr. II. 115). Dr. Mercedes Otero de Ramos, the Administrator of Correction, testified that she first raised the emergency temporary housing project with the Governor's Criminal Justice Task Force on September 25, 1990 (Tr. II. 142). Written confirmation of financing for the plan was received by Dr. Otero on October 24, 1990 (during the recess in the hearing) (Tr. IV. 4, Plaintiffs' Ex. 5), although no specific amount of money has been approved or allocated (Tr. IV. 5).

This testimony convinces the Court that the emergency temporary housing plan is nothing more than a last minute effort by defendants, reflecting the exigencies of litigation. Mr. Arias, an architect by profession, has served as the Director of the Public Buildings Authority since 1985 (Tr.

II. 74–75). During that time he has been responsible for construction of 21 penal projects with a total value of $230,744.852 (Tr. II. 76). His testimony, which the Court fully credits, establishes explicitly that defendants could have taken steps to comply with the January 26, 1987, order in 1988, following the Court's approval of a one-year delay in achieving the 55 square foot standard, and in 1989 and 1990, while the Court stayed its hand on plaintiffs' June 9, 1989, motion for contempt sanctions.

According to Dr. Otero, the projected capacity of the system in June of 1991 will be approximately 10,962, including the 1,000 beds contemplated by the emergency temporary housing plan (Tr. II. 138–39). Current capacity is 9,138 (Tr. II. 137). As of October 15, 1990, the total population of the AOC was 9,873 (Defendants' Ex. I).

Projections for the actual population to be housed in June 1991 are in conflict. Projections prepared in April 1989 by the Office of Planning of the AOC predict a total population of 11,354 by June 1991 (Defendants' Ex. L).[7] Projections prepared by the Administrator of Correction and filed on October 1, 1990, predict a total population of only 10,262 in January 1992. These same projections reflect a total population of 9,688 in January 1991 (Plaintiffs' Ex. 3) although, as been noted, the actual population on October 15, 1990, already exceeded the January 1991 projection.[8]

---

7. The Administrator of Correction testified that she was not relying on the April 1989 projection for the following reasons:

Because that projection was made from 1986 to 1988 as a basis, and the variables that were being considered were taken on the basis of tendencies from previous years, and this situation of the impact that was being created, by the new changes, when imposing the alternatives, were not considered in that projection. (Tr. II. 132) The "new changes" referred to by Dr. Otero consisted of legislation enacted in 1989 authorizing retroactive increases in good time (Tr. III. 80).

It is noteworthy, however, that the April 1989 projections predicted a total population of 9,487 at the end of January 1990 (Defendants' Ex. L, p. 10). In fact, the total population on that date was 9,297 (109th Report of the Court Monitor). Thus, the April 1989 study was accurate within .02%.

The April 1989 study projected a population of 10,281 as of June 30, 1990, at which time the actual population of the AOC was 9,206. On June 29, 1990, the total population was 9,439 (128th Report of the Court Monitor). Thus, the range of accuracy of the April 1989 projection in this instance is .08% to .10%.

Defendants, of course, are free to disregard the April 1989 projections if they choose to do so. They cannot claim surprise, however, at the level of population that existed on June 30, 1990. Indeed, the Acting Director of the AOC's Planning Office testified that the October 10, 1990, population of 9,941 was "more or less" predictable (Tr. III. 69–70). Defendants also assume the risk that the projections of the Planning Office for June 1991 may be accurate.

8. Indeed, the actual AOC population in August 1990 was 9,756, or 68 greater than the January 1991 projection filed on October 1, 1990. Ap-

Yet, a third projection was offered by Dr. Otero, who testified that the population will be 10,703 in June of 1991 (Tr. II. 130–31) although the source of that projection is not clear.[9]

In view of this evidence, the Court is not sanguine that construction of the contemplated emergency temporary housing will be sufficient to permit compliance with the 1986 stipulation. Given the near certainty that defendants' capacity will not exceed that projected by Dr. Otero, and the conflicting evidence of population projections by the AOC for June 1991, the Court cannot find that defendants' emergency temporary housing plan, even if successfully implemented, will result in compliance with the 55 square foot requirement of the 1986 stipulation.

The Court heard substantial evidence indicating that the emergency temporary housing project is likely to be a failed venture. Sites for the proposed beds were selected by the Criminal Justice Task Force on the exclusive criterion of the availability of land (Tr. II. 80). The project is opposed by the AOC's Deputy Director of Operations, who questioned the adequacy of electricity, security staff, and the ability of the AOC to identify the proper number of minimum custody inmates to assign to the temporary beds (Tr. I. 168–69). Mr. Montgomery specifically questioned the sites selected for the temporary beds:

> ... I specifically questioned Zarzal, I specifically questioned Punta Lima because of existing problems that I was aware that existed there at the time, such as the water tower on the hill side

at Sabana Hoyos, but the only reason I've seen in getting the visibility that it was getting was to prevent being fined, being boxed, that's my opinion, I mean I am not speaking for the Administration of Corrections.

(Tr. I. 170) Although it appears that certain improvements will be made to the infrastructure of the existing institutions where emergency housing will be constructed (Tr. II. 85–87), the Court seriously questions whether defendants have given sufficient weight to their own findings regarding the serious environmental inadequacies they themselves have found at these institutions (Plaintiffs' Ex. 4, Tr. IV. 10).[10]

Plaintiffs' correctional expert expressed his strong belief that the emergency temporary housing plan is "ill-fated," even expressing doubt that the physical construction itself could be completed successfully (Tr. III. 109–10). He expressed serious concern about the "very tenuous infrastructure" and severe environmental deficiencies he had observed at these institutions, and he noted that in some instances these institutions "do not even meet the minimum human habitation requirements" (Tr. III. 118–19). Mr. Martin also noted that, in his opinion, the AOC does not have the managerial capacity or the staff to implement or to run the emergency temporary housing project (Tr. III. 134). His opinion of defendants' plan was summarized in the following testimony:

> ... we saw last Saturday that it's a busted broke system, that there is not more serious harm, and there may be

parently, the projection was prepared earlier for filing with defendants' July 20, 1990, Comprehensive Plan (Tr. III. 81). The actual population at the end of July 1990, however, was 9,592, only 96 fewer than the projection for January 1991 (Defendants' Ex. I). In summary, the Court places no confidence in the projections filed on October 1, 1990.

9. Although Dr. Otero describes this figure as being the result of "the last projection that we made" (Tr. II. 131), the Director of the AOC's Planning Office describes the April 1989 study as setting forth the most recent official projections prepared by that office (Tr. III. 80–81).

10. For example, defendants found that "there is no qualified operator [of the water supply sys-

tem]" and that "the pertinent routine samplings have not been conducted for the past two or three months" at Sabana Hoyos. "The garbage remains without being picked up for a long time," and "there are no clothes for the inmates, not even for an entrance to the institution." Defendants found "no clothing available" for inmates and an absence of fire prevention equipment at Punta Lima. Leaking showers, damaged equipment in the waste water treatment plant, an inadequate supply of mattresses, and absence of wash basins and bathrooms were noted at Zarzal. These observations were made for the months of July through September 1990 (Plaintiffs' Ex. 4).

that we have not detected, is amazing to me.

To suggest that over a time span of four weeks, three weeks, that you can commit yourself to building a thousand units, in seven months, to eliminate the problems that I have seen and read about, is probably one of the most astoundingly crazy suggestions that I have come across in my professional career, it is just a prescription to failure.

(Tr. III. 126).

### III. Conclusions of Law Concerning Defendants' Motion to Modify

This being its third opportunity to address a request by defendants to modify the September 1986 stipulation, the Court need not repeat its earlier conclusions regarding the law controlling modification of a stipulated injunctive decree. The Court specifically incorporates the analysis set forth in *Morales Feliciano v. Hernández Colón,* 672 F.Supp. 627 (D.P.R.1987). The Court also addressed this legal issue in its June 7, 1990, Opinion and Order denying modification of the 55 square foot standard, and the reasoning set forth in that opinion also is incorporated herein.

The findings of the Court make it clear that defendants have not borne their burden to establish entitlement to modification by demonstrating that, by virtue of changed circumstances, the decree will not accomplish its underlying objective of ameliorating unconstitutional conditions throughout the AOC. To the contrary, further delay in the provision of minimally adequate living and sleeping space to all AOC prisoners will detract from the achievement of that objective. Defendants have failed to make a case for modification by any standard, including the "flexible" standard announced by *New York State Association v. Carey (Willowbrook),* 706 F.2d 956 (2nd Cir.1983). *See Inmates of the Suffolk County Jail v. Kearney,* 734 F.Supp. 561 (D.Mass.1990).

In summary, in September 1986, defendants agreed to provide each prisoner in the AOC with at least 55 square feet of living and sleeping space no later than January 1, 1988.[11] When defendants first sought a delay in implementation of this agreement, the Court extended the deadline to January 1, 1989. Faced with a second motion to modify in December 1988 and plaintiffs' subsequent motion for contempt sanctions, the Court delayed setting this matter for hearing for almost two years hoping that defendants would take steps to effectuate their promise without additional coercive action on the part of the Court. Instead, defendants have permitted the situation to deteriorate to the extent that even the 35 square foot standard is not being met at some institutions today. They premised their third motion to modify on a then-unwritten "comprehensive compliance plan," which they later abandoned in favor of their "emergency temporary housing plan" first conceived on September 25, 1900, less than one month prior to the commencement of hearings on this matter. The Court can only conclude that defendants' grounds for modification not only are legally insufficient, but that they also are grounded in bad faith. *United States v. Oregon State Medical Society,* 343 U.S. 326, 333, 72 S.Ct. 690, 695, 96 L.Ed. 978 (1952) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit, and there is probability of resumption."); *Newman v. Graddick,* 740 F.2d 1513, 1521 (11th Cir.1984).

Defendants are entitled to implement any "comprehensive compliance plan" they wish, so long as that plan comports with existing orders in this case. Moreover, whatever doubts the Court may have regarding the efficacy of the emergency temporary housing plan, defendants are entitled to implement that plan. They have made no showing, however, that modification in the form of further delay is war-

---

**11.** This space, it should be noted, includes the area taken up by a bed and footlocker, when

beds and footlockers are made available.

ranted, and their motion to modify will be denied.

## IV. *Findings of Fact Regarding Plaintiffs' Motion for Contempt Sanctions*

Without question, plaintiffs have proved noncompliance with the 55 square foot provision on the September 1986 stipulation by clear and convincing (indeed, uncontroverted) evidence. The first report of the Court Monitor setting forth violations of the 55 square foot standard reflected 10,305 prisoners housed in violation of that standard during the 14–day period covered by that report. *See* 92nd Report of the Court Monitor—Seventy–Fifth Report Pursuant to the Court's Order of July 23, 1987, submitted on December 5, 1989.[12] The most recent report of the Court Monitor admitted into evidence at the hearing reflects a total of 13,247 prisoners housed in excess of institutional and housing unit capacities at 55 square feet of sleeping and living space per prisoner for the 14–day period covered by that report. *See* 140th Report of the Court Monitor—103rd Report Pursuant to the Court's Order of July 23, 1987, filed on October 22, 1990. At no time during the interval between these reports were defendants remotely close to compliance with the terms of the stipulation.

Although defendants have urged that construction of additional facilities is the only viable alternative to unconstitutional crowding, they have offered no credible evidence that a building program could not have begun earlier to achieve compliance with the 1986 stipulation. To the contrary, as has been noted earlier in this opinion and order, the Director of the Public Buildings Authority since 1985, who has supervised more than $230,000,000 worth of penal construction projects, testified that defendants' "emergency" building program could have begun two years ago (Tr. II. 75–76, 115). Moreover, as has been pointed out, defendants cannot claim unforeseeable population increases that made compliance impossible or even impracticable.[13] Finally, defendants failed to refute that other means were at hand to accomplish the constitutional objective of the 1986 stipulation, *e.g.*, expansion of the Expedited Bail Project (Tr. III. 123, 137–38), increased efficiency and funding of the parole board (Tr. III. 125), increased use of the clemency program, half-way houses, and electric monitoring, and use of any reporting centers (Tr. III. 138).[14]

## V. *Conclusions of Law Regarding Plaintiffs' Motion for Contempt Sanctions*

Again, the Court will incorporate by reference its detailed discussion of the law governing contempt in earlier opinions and orders. *See* Order of July 23, 1987, (holding defendants in contempt for failure to provide 35 square feet of living and sleeping space to each prisoner); *Morales Feliciano v. Hernández Colón*, 697 F.Supp. 37 (D.P.R., *aff'd sub nom. Morales Feliciano*

---

**12.** This number reflects only the *excess* of prisoners beyond the maximum capacities of institutions and housing units. Because all prisoners in noncompliant housing units are affected by crowding, the actual number of prisoners being deprived of 55 square feet of sleeping and living space is much greater. Moreover, all prisoners in an overcrowded institution suffer the ill effects associated with that condition, including deteriorated environmental conditions, absence of services and programming, and excessive violence.

In their August 10, 1987, Motion Requesting Clarification of Order of July 23, 1987, and for Modification of Recommendations of Monitor's Fifth Report, plaintiffs asked that the fine then being imposed be levied for every prisoner deprived of the minimum required space. In its order of August 14, 1987, the Court acknowl-edged the logic of plaintiffs' position, but limited the fine to the number of prisoners assigned in excess of institutional or housing unit capacities.

**13.** *See* note 7, *supra*.

**14.** Although defendants attempted to introduce testimony that early release resulting from the passage of legislation in 1989 implementing retroactive awards of good time brought about a dramatic increase in criminality (Tr. II. 24), defendants' proffered evidence—even had it been admitted—does not suggest, let alone support, the conclusion that the cited alternatives pose any threat to the public safety or to public perceptions of criminality. None of these alternatives would result in the automatic release of any pretrial detainee or sentenced prisoner.

*v. Parole Board of the Commonwealth of Puerto Rico*, 887 F.2d 1 (1st Cir.1989) (increasing fines for noncompliance).

As has been pointed out in the findings of fact set forth above, the number of prisoners suffering harm as a result of defendants' inaction is substantial and at least as large as the percentage cited by the Court of Appeals in its affirmance of this Court's earlier order. *Morales Feliciano v. Parole Board of the Commonwealth of Puerto Rico*, 887 F.2d at 5. Likewise, the period of noncompliance has been as long as that preceding the increase in fines approved by the Court of Appeals in connection with defendants' noncompliance with the 35 square foot requirement of the same stipulation. *Id.* Moreover, the Court believes there is ample evidence to refute any claim of "good faith" on the part of defendants even if that element constituted a sufficient legal excuse for failing to comply. *Fortin v. Commissioner of Mass. Dep't of Pub. Welfare*, 692 F.2d 790, 796–97 (1st Cir.1982). Finally, any reliance by defendants on *Nelson v. Collins*, 659 F.2d 420 (4th Cir.1981), is as inapposite now as it was in their argument before the Court of Appeals in 1989. *Morales Feliciano v. Parole Board of the Commonwealth of Puerto Rico*, 887 F.2d at 5.

### VI. *Remedy*

■ The sanction imposed by the Court will be designed to serve the function of coercing future compliance with its order. *United States v. United Mine Workers*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The relief sought by plaintiffs, both conditional retroactive fines and prospective fines of $125 per prisoner per day, could be justified on the basis of the record before the Court. *Cabrera v. Municipality of Bayamón*, 622 F.2d 4 (1st Cir.1980). Moreover, the Court is aware of the fact

that nothing other than the imposition of heavy fines appears to move defendants toward compliance.

These facts notwithstanding, the Court is sensitive to the substantial fines that have been paid and that continue to be paid by the Commonwealth for failure to achieve compliance with the 35 square foot requirement of the 1986 stipulation.[15] Moreover, the Court wishes to dispel any perception that the remedy it adopts is intended to be punitive in effect, an impermissible purpose of a fine in the context of civil contempt. *Hick v. Feiock*, 485 U.S. 624, 108 S.Ct. 1423, 99 L.Ed.2d 721 (1988).

Therefore, effective as of the date of this order, the Court will impose a prospective fine of $10.00 per prisoner per day for each prisoner assigned to an institution or to a housing unit in excess of the maximum capacity established by the Court's order of January 26, 1987, approving and adopting as an order the parties' stipulation of September 8, 1986. For the purpose of this order, the maximum capacity of any institution and housing unit will be that which is designed to provide each prisoner with at least 55 square feet of living and sleeping space. The fine will be increased by $5.00 per prisoner per month on the first day of each succeeding month for each continuing violation.[16]

WHEREFORE, it is hereby

ORDERED that defendants' motion to modify the Court's order of January 26, 1987, should be, and hereby is DENIED. It is further

ORDERED that defendants should be, and hereby are, adjudged to be in continuing civil contempt of the Court's Order of January 26, 1987, for their failure to provide each prisoner in the Administration of Correction at least 55 square feet of living and sleeping space in accordance with the aforementioned order. It is further

---

15. All but two institutions were providing at least 35 square feet of living and sleeping space per prisoner as of October 1, 1990. *See* 140th Report of the Court Monitor. Thus, although fines have not been fully effective to date to remedy noncompliance, it cannot be said that they have been without constructive effect.

16. Again, the Court will limit the impact of this fine by applying it only to the number of prisoners assigned in excess of institutional or housing unit capacities rather than to all prisoners housed in an institution or housing unit in which capacity is exceeded. See note 12, *supra.*

ORDERED that, effective as of the date of this order, a daily fine of $10.00 per prisoner shall be paid by defendants whenever an inmate is held in an institution where the maximum capacity, calculated on the basis of 55 square feet of living and sleeping space per prisoner, is exceeded. The same fine shall be paid whenever a prisoner is held in a cell, dormitory, or any other particular housing unit within an institution in excess of the maximum capacity, calculated on the basis of 55 square feet of living and sleeping space per prisoner, of any such cell, dormitory, or housing unit. It is further

ORDERED that the fine imposed in the immediately preceding paragraph shall increase by the sum of $5.00 per month per prisoner on the first day of each succeeding month until defendants have achieved compliance with the Court's Order of January 26, 1987. It is further

ORDERED that all fines paid pursuant to this order shall be deposited in the registry established by the Clerk of the Court for the receipt of fines pursuant to the Court's order of July 23, 1987, where they shall be held until further order of the Court in accordance with the provisions of its orders of October 24, 1989. It is further

ORDERED that the Court Monitor shall continue to report to the Court on a regular basis the extent of noncompliance for the purpose of computing any fines required to be paid pursuant to this order.

IT IS SO ORDERED.