Carlos MORALES FELICIANO,
et al., Plaintiffs,

v.

Rafael HERNANDEZ COLON,
et al., Defendants.

Civ. No. 79–4 (PG).

United States District Court,
D. Puerto Rico.

June 25, 1991.

Nachman & Fernandez Sein, Santurce, P.R., McConnell Valdes Kelley Sifre Griggs & Ruiz-Suria, San Juan, P.R., Carlos Ramos Gonzalez, Santurce, P.R., Jose A. Fernandez Paoli, Miramar, Santurce, P.R., Carlos Garcia Gutierrez, Gonzalez Badillo & Davila, Harry Anduze, Pia Gallegos, Hato Rey, P.R., Jeffrey Williams, San Juan, P.R., for plaintiffs.

Ramirez & Ramirez, Hato Rey, P.R., Pedro Del Valle, Federal Lit. Div., Dept. of Justice, San Juan P.R., for defendants.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS MOTION FOR PARTIAL AND TEMPORARY RELIEF FROM FINES

PEREZ–GIMENEZ, Chief Judge.

## I. INTRODUCTION

This court yet again is confronted with an effort by the Commonwealth of Puerto Rico to evade the coercive force of contempt sanctions and, in so doing, to continue its long resistance to rectifying pervasive unconstitutional conditions of confinement in Puerto Rican prisons. In their May 6, 1991 *Motion Seeking Partial and Temporary Relief from Fines*, defendants sought a reduction of fines imposed as a result of their decade-long failure to comport with this court's orders requiring the Administration of Corrections (AOC) to provide at least 35 square feet of living and sleeping space to each person incarcerated in its penal institutions. This most recent attempt to control the cost of noncompliance founds itself on an altogether specious argument. Because the court had been forced to close admissions to an institution overcome by life-threatening environmental and health conditions, defendants contend they are entitled to relief from the fines generated by the attendant rise in population at other institutions.[1]

Plaintiffs, quite naturally, opposed defendants' motion. On May 30, 1991, the court conducted a hearing on the matter. For the reasons set forth in this memorandum opinion, defendants' motion is denied.

## II. HISTORY OF 35 SQUARE FEET STANDARD AND DEFENDANTS' CONTEMPT

The sheer audacity of defendants' motion can only be understood fully in the context of prior proceedings relating to the 35 square feet standard. In its March 21, 1986 memorandum opinion, the court attempted to describe the effects of overcrowding on the quality life in prison:

> Overcrowding is at the center of the many ills which make the conditions of imprisonment in the Commonwealth's penal institutions constitutionally unacceptable. Neither statistics nor anecdote will suffice to express the intensity of confinement, physical and psychological, to which the plaintiff class is condemned.... As the court visited each institution, the sense of physical closeness and the revulsion at so much compressed humanity grew to an awareness of the psychological stress which must affect any human being almost totally deprived of privacy or intimacy.

*Morales Feliciano v. Romero Barceló*, 672 F.Supp. 591, 597 (D.P.R.1986).

From this matter's inception twelve years ago, this court has made clear time and again its conviction that crowding creates, contributes to, or exacerbates virtually every adverse and dangerous condition of confinement. *See Morales Feliciano v. Romero Barceló*, 497 F.Supp. 14 (D.P.R.1980) (issuing preliminary injunction). Thus, as early as 1980, defendants were ordered to provide each member of the plaintiff class temporarily with at least 35 square feet of living and sleeping space; ultimately, the court envisioned that each inmate confined to a closed cell would be provided with at least 70 square feet of space while inmates assigned to dormitories would receive at least 55 square feet. *Morales Feliciano v. Romero Barceló, supra*, 497 F.Supp. at 41.

---

1. For a detailed history of the pertinent orders and stipulations regarding crowding, *see* section II, *infra*.

Between issuance of the preliminary injunction and September 1986, defendants at no time complied with the 35 square feet standard. On September 10, 1986, the parties entered into a stipulation, the terms of which were provisionally approved by the court on September 26, 1986 and finally approved on January 26, 1987. In general, the stipulation set institutional and housing unit capacities for dormitories first at 35 square feet per inmate and ultimately at 55 square feet, and required that cells containing less than 70 quare feet be used to house only one inmate. The stipulation also provided, however, that in specific cell blocks in which "open celling" was permitted, cells containing less than 70 square feet could be used to house two prisoners.[2] Finally, the stipulation and order required compliance with the 35 square feet standard at every institution by January 1, 1987.[3]

Inmates still were being provided with less than 35 square feet of living space in July 1987. On July 23, upon motion by plaintiffs and after a hearing, the court found defendants in contempt of its January 26, 1987 order and ordered them to pay sanctions in the amount of $50,000 as well as a prospective fine of $10 per day for each inmate housed either in an institution in which the total population exceeded the total capacity at 35 square feet or in a housing unit in which the population exceeded the capacity at 35 square feet.[4] At the time this order was issued, nearly seven years had passed since defendants first were ordered to comport with the 35 square feet standard and seven months had

passed since the January 1, 1987 deadline. Based on the testimony offered by defendants at the contempt hearing, the court found that "by and large, the only efforts that have been made to achieve compliance with the court's order on crowding have involved the construction of new housing units for prisoners. No coordinated efforts have been made by the Commonwealth to control the flow of prisoners into or out of existing facilities." July 23, 1987 order, 697 F.Supp. 26 at 34.

Rather than appealing the July 23, 1987 order, defendants moved for modification of the underlying consent decree pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. They based their motion on a number of grounds, including—ironically enough—the planned construction of Bayamón 1072. *See section III, infra.* In its September 14, 1987 opinion and order, the court denied modification, noting that

> defendants have provided no support for the proposition that, by virtue of ... changed circumstances, they should be relieved from the requirement of providing inmates with 35 square feet of living space. The underlying rights of inmates remain fully accrued, yet denied, and will until defendants take their obligations under the order seriously, and fulfill them.

*Morales Feliciano v. Hernández Colón,* 672 F.Supp. 627, 634 (D.P.R.1987).

By August 1988, defendants still had not achieved compliance with the 35 square feet standard. Plaintiffs moved for an increase in the amount of the fines, which

**2.** "Open celling" refers to a practice in which cell doors remain open 24 hours per day, allowing inmates free access to adjacent corridor space, under certain conditions. *See* September 8, 1986 stipulation, Article 3.

**3.** The September 1986 stipulation and order also set a January 1, 1988 deadline for system-wide compliance with the 55 square feet standard. After three years of motions for modification of the order and court-ordered postponements of the deadline, defendants were held in contempt for their failure to provide the required amount of space on January 10, 1991. *See Morales Feliciano v. Hernández Colón,* 754 F.Supp. 942 (D.P.R.1991), *appeal docketed,* No. 91–1206 (1st Cir. March 5, 1991).

Because the January 10 order currently is pending before the Court of Appeals, plaintiffs argue and defendants concede that this court is divested of jurisdiction to modify it. The fines assessed for violations of the 55 square feet standard thus are not before the court at this time.

**4.** As early as August 1987, when the first fines were imposed, the court recognized their potential magnitude. It thus limited the assessment of fines to the excess number of inmates in a particular institution or housing unit rather than to the entire population of the institution or unit. *See* August 14, 1987 order at 2.

was granted in an August 15, 1988 order. "In view of defendants' failure to abide by the maximum capacities ... and the absence of legal excuse for such noncompliance, any failure by the court to increase the sanction in an effort to achieve the objective of the original order would be tantamount to abdication of the judicial function." August 15, 1988 order at 6. Thus, the daily fine per inmate was raised initially to $50, to increase by $10 monthly until compliance was achieved. This increase was affirmed by the Court of Appeals. *See Morales Feliciano v. Hernández Colón,* 887 F.2d 1 (1st Cir.1989).[5]

The impact of these fines at last was felt, and the combination of new facilities, the passage of legislation increasing "good time" awards for inmates,[6] and the commencement of the Expedited Bail Project (E.B.P.) contributed to a reduction in crowding.[7] Between January and August 1990, the Commonwealth owed virtually no fines for violations of the 35 square feet standard. *See* 106th, 109th–112th, 116th, 117th, 120th, 122nd–124th, 126th, 128th, and 130th Reports of the Court Monitor pursuant to the court's July 23, 1987 order.

In August 1990, however, the population at certain institutions began to creep upward once again. *See 131st Report of the Court Monitor—99th Report Pursuant to the Court's Order of July 23, 1987,* confirmed October 26, 1990. As the *132nd Report of the Court Monitor—Report on Reintegration,* confirmed April 23, 1991, later revealed, this increase derived from the levelling-off of "good time" releases and the failure of defendants to implement functional early release programs and pre-

release services. During the 13–day period ending on October 18, 2,159 inmates were held in institutions or housing units in which the population exceeded capacity at 35 square feet.[8] *See 142nd Report of the Court Monitor—104th Report Pursuant to the Court's Order of July 23, 1987,* confirmed January 18, 1991.

On October 1, 1990, the daily fine per prisoner reached $310. per day. On February 6, 1991, following the filing of the 142nd Report, which assessed fines for October 3–18, 1990, the court issued an order, *sua sponte,* limiting the fine to $300 per prisoner, per day. The reason for this order was stated succinctly: "Although it is clear that even increased fines per prisoner have not resulted in full compliance with the relevant provisions of the court's order of January 26, 1987 ... the court has concluded that a continuation of a fine at $300 per prisoner per day constitutes a reasonable, non-punitive sanction that should be sufficient to coerce compliance." February 6, 1991 *Order re: 142nd Report* at 1. Thus, throughout the labyrinthine course of litigation on this issue, the court at every turn has weighed the nature and breadth of the sanctions imposed and tailored them to their coercive purpose.

## III. FINDINGS OF FACT

Defendants premise their motion on a single argument: that because the closing of admissions at the Bayamón 1072 and Miramar facilities led to crowding at other institutions, the government should be granted a "temporary respite" from the ensuing increase in fines. Counsel assert-

---

**5.** In the same motion, plaintiffs asked the court to reconsider its August 14, 1987 decision to only assess fines *vis-à-vis* population in excess of the stipulated capacity. After careful consideration, the court once again refused this request, recognizing the potentially "staggering" amount of such fines. It remarked, however, that "perhaps, eventually, the court will have no choice but to adopt such a draconian measure." August 15, 1988 order at 6.

It is worth noting that the population of the State Penitentiary in August 1988 was 1638, or roughly 146.25% of its capacity at 35 square feet. *Id.* at 4. This is almost identical to the facility's population level in March 1991. *See*

*156th Report of the Court Monitors—Report on Conditions at the State Penitentiary.*

**6.** *See* Amended Good Time Credit Law, 4 L.P.R.A. 1162, 1165 (amended July 20, 1989).

**7.** *See* April 28, 1988 order at 1 (creating Expedited Bail Project).

**8.** The injunction pertaining to Bayamón 1072 was issued on October 23, 1991. Thus, the increase in fines was not, as defendants contend, directly attributable to the closing of admissions at that facility. Instead, the spiral already had begun its upward climb. *See* section III, *infra.*

ed during oral argument that the Commonwealth would be "willing" to pay $1.2 million monthly for the period of time between October 22, 1990, when admissions were closed at Bayamón 1072, and June 15, 1991, when the AOC expected the facility to be ready to accept admissions once more.[9] It should be noted that at the time the instant order was entered, defendants had not yet petitioned the court for either a modification of its preliminary injunction regarding Bayamón 1072[10] or a modification of the March 5, 1991 stipulation that closed admissions at Miramar.

Because defendants' argument is based on facts well-known to the court, they did not offer testimony or documentary evidence at the May 30 hearing, but instead relied on the oral argument of counsel. Because the issues at hand cannot be addressed without a full understanding of the circumstances that led to the closing of admissions at the two institutions, however, those circumstances bear recitation here.

*Bayamón 1072*

On October 22, 1990, plaintiffs moved for a temporary restraining order seeking, among other relief, the closing of admissions to Bayamón 1072 until such time as the population of the institution was reduced to its capacity at 55 square feet of 1,648 inmates and running water was available throughout the institution. As the parties and the court were already assembled on the morning of October 22 for the commencement of long-delayed hearings regarding plaintiffs' motion for contempt and defendants' motion for modification re-

garding the 55 square feet stipulation, the court decided to visit Bayamón immediately.

The situation at the facility shocked the conscience and constituted a graphic illustration of the defendants' complete lack of progress toward rectifying the unconstitutional conditions outlined in the September 8, 1980 preliminary injunction and the March 21, 1986 memorandum opinion. The daily inmate count was 2,069, 421 in excess of the facility's capacity. Crowding was so severe in some buildings that inmates had been assigned to sleep on the floors of shower rooms. Many inmates did not have mattresses and were sleeping on concrete floors, without sheets. The second floor of the institution completely lacked water, leaving over 1000 inmates without toilets, showers, sinks, or drinking water. Water pressure on the first floor was so low that it, too, was without effective plumbing and drinking water. The resultant stench was overwhelming.

Inmates complained, and the institutional superintendent later confirmed, that the prisoners frequently were not provided with three meals a day and that food frequently ran out before all inmates were fed. There were insufficient eating utensils and trays for the inmates, forcing them to eat out of tin cans with their hands. Inmates also lacked basic hygiene supplies, such as soap, toothpaste, toothbrushes, and toilet paper, as well as clothing.[11]

In this rancid setting, overtly mentally ill inmates were mixed with the general population and received no treatment for their

---

**9.** This amount derived from the Court Monitor's 142nd Report, which assessed fines in the amount of $647,700. for a 13–day period preceding the issuance of the October 23 preliminary injunction. *See* defendants' May 6, 1991 motion, para. 14, at 9; *see also* February 6, 1991 order at 2. The most recent fines assessed against defendants for violations of the 35 square feet standard totaled $1,349,700. for the fourteen-day period commencing January 10, 1991 and ending January 23, 1991. *See 154th Report of the Court Monitor—110th Report Pursuant to the Court's Order of July 23, 1987,* confirmed May 3, 1991.

**10.** The court has agreed, however, to reopen partially admissions to buildings 7 and 4, pursuant to a stipulation of the parties regarding plaintiffs' May 16, 1991 *Motion for Emergency Relief and for an Order to Show Cause Why the Río Piedras State Penitentiary Should Not Be Enjoined from Admitting Any New Arrivals and for Other Relief. See* note 12, *infra.*

**11.** These conditions constituted pervasive violations of both the September 8, 1980 preliminary injunction and the defendants' environmental plan. *See Eightieth Report of the Court Monitor—Report Recommending Adoption of Environmental Plan,* Appendix A, confirmed March 30, 1990.

illnesses.[12] Inmates also suffered from physical ailments ranging from broken bones to AIDS. No effort had been made to separate highly contagious prisoners from the general population, and inmates complained of a lack of medical attention.[13]

Faced with these and other patently unconstitutional conditions at Bayamón 1072, the court issued a preliminary injunction from the bench at the close of the October 22 hearing. *See* October 22, 1991 *Preliminary Injunction.* The injunction granted a variety of relief to the plaintiff class, including the closure of admissions to the institution until such time as the population was reduced to its institutional capacity and until running water was available in all areas of the prison; the repair and maintenance of all toilets, lavatories, and drinking fountains; the medical evaluation of all inmates and transfer of those with medical needs that could not be met at the facility to appropriate medical settings; the mental health evaluation of all inmates and the transfer of those needing mental health treatment to suitable institutions; the immediate provision of three meals a day to each prisoner; and the immediate provision of bedding, linen, hygienic supplies, and clothing to each prisoner.

*Miramar*

The Miramar Penal Institution for Young Adults houses inmates between the ages of 16 and 21. It is the only institution in Puerto Rico for young offenders. On January 3, 1991, plaintiffs filed their *Emergency Motion for an Order to Show Cause Why the Miramar Penal Institution for Young Adults Should Not be Closed.* In their motion, plaintiffs alleged violations of virtually every remedial order issued thus far in this litigation.

Over the course of three days of testimony, the court heard of Dickensian horrors at the institution. In February 1991, Miramar was crowded to well over 200% of its capacity of 147 inmates. In the main dormitory area, two toilets served 300 inmates, many of whom could only use the sanitary facilities if the frequently absent guards agreed to open the padlocked gates between housing units. When they were not granted the privilege of a toilet, inmates relieved themselves in tin cans.

Most inmates had no bed, and many had not even a mattress. None were provided with sheets, towels, or toiletries. The facility's roof leaked, and most of the walls lacked windows, resulting in flooding during the frequent tropical rainstorms.

The youths of Miramar require intensive socio-penal services, which were not provided to them. In addition, inmates went for weeks or months without a single hour of outdoor recreation. Although this court did not enter findings of fact regarding Miramar, the uncontroverted testimony made clear the rampant constitutional violations suffered by inmates at the facility.

Contrary to defendants' assertion during the May 30, 1991 hearing on the instant motion, however, the court did not unilaterally impose the closing of admissions to Miramar. Instead, on March 5, 1991, the parties entered into a stipulation, which was approved by the court, in which defendants agreed to close admissions to the institution until the population conformed to the facility's capacity at 55 square feet. By this time, four and one-half months after the October 22 injunction had been issued, defendants were well aware of the implications of closing admissions to another facility.

*State Penitentiary*

Hovering in the background of these proceedings is plaintiffs' May 16, 1991 motion for emergency relief at the State Penitentiary, which has absorbed much of the population overflow from Bayamón 1072 and Miramar and currently is responsible for the bulk of the fines at 35 square feet. *See* 154th Report, *supra,* at 2. This motion followed on the heels of the *156th Report of the Court Monitor—Report on Conditions at the State Penitentiary.* Both the

---

**12.** *See generally Amended 62nd Report of the Court Monitor—Report Recommending Adoption of Medical and Mental Health Plans,* Appendix B, confirmed January 2, 1990.

**13.** *See generally id.* at Appendix A.

motion and the report graphically illustrate conditions of confinement at the penitentiary that mirror those found at Bayamón 1072 and Miramar. So extreme is the degree of physical deterioration and denial of basic services at the facility that the situation could not possibly have arisen out of crowding alone. Instead, it bespeaks ongoing neglect of every aspect of prison administration.

Although the court commenced a hearing on the State Penitentiary motion earlier in the day on May 30, the parties eventually entered into a stipulation in which defendants agreed, *inter alia*, to close admissions to the facility's two intake units. That the stipulation also permitted the inmates placed in those units to be transferred to building 7 of Bayamón 1072 is ironic and illustrative of the reactive approach that defendants have taken toward this litigation.[14] Rather than working to achieve and maintain compliance with the court's orders, defendants simply are pouring water from one glass into another. In so doing, they are trading institutions off against each other and militating against systemic improvement.

The gist of plaintiffs' opposition to defendants' motion is clear: the court should not reward defendants' knowing creation and perpetuation of pervasive unconstitutional conditions in two institutions by reducing fines designed to coerce compliance with court orders throughout the system. They called two witnesses in support of this position. The first was Charles M. Montgomery, Director of Operations for the AOC. Mr. Montgomery has testified before this court on numerous occasions, and the court consistently has been impressed with his candor concerning problems within the agency and its penal institutions.

Upon questioning by plaintiffs' counsel, Mr. Montgomery stated that correctional systems throughout the country are faced with overcrowding. Most notably, he referred to the Federal Bureau of Prisons, where he was employed for 23 years. As Mr. Montgomery pointed out, however, no system can build itself out of overcrowding, as the AOC is attempting to do.[15] Instead, other means of population reduction must be employed, including but not limited to viable parole, executive clemency, furlough, work and study release, or electronic monitoring programs. Although these programs nominally exist in Puerto Rico, Mr. Montgomery stated that the Commonwealth is "in the dark ages" compared to the Federal Bureau of Prisons in terms of the programs' utilization and effectiveness in crowding reduction. Mr. Montgomery's message was clear: the AOC has the means at its disposal to reduce crowding, and therefore fines, but has elected not to use those means to their full advantage.

Plaintiffs' second witness was Steve J. Martin, a correctional expert. Mr. Martin testified that, in his opinion, a reduction in fines would eliminate much of the coercive force of the court's contempt sanctions.

## IV. CONCLUSIONS OF LAW

Although defendants are seeking "partial and temporary relief from fines," their motion can only be considered a motion for relief from this court's judgment of July 23, 1987 holding them in contempt and imposing sanctions and the two subsequent orders that modified the amount of the fines imposed.[16] *See United States v. Work Wear Corp.*, 602 F.2d 110 (6th Cir. 1979) (motion for reduction of contempt fines considered as motion for modification). As this court has addressed requests

---

**14.** The court's decision to permit the partial reopening of building 7 was based on Mr. Montgomery's testimony that it was "substantially repaired." This testimony was not refuted by plaintiffs. The stipulation also permitted building 4 to be reopened for use as an "incentive unit" for inmate workers at the facility, pursuant to Mr. Montgomery's testimony.

**15.** Defendants' most recent attempt to comply with the September 26, 1986 order involves the

building of 1000 "temporary" minimum custody beds at three penal camps. For a lengthy discussion of this proposal, *see* January 10, 1991 *Memorandum Opinion and Order Denying Modification and Imposing Sanctions for Contempt* at 8–14.

**16.** *See* August 15, 1988 *Order Increasing Fines* and February 6, 1991 *Order re: 142nd Report of the Court Monitor—105th Report Pursuant to the Court's Order of July 23, 1987.*

for modification by defendants on three prior occasions, it specifically incorporates the analysis set forth in *Morales Feliciano v. Hernández Colón*, 672 F.Supp. 627 (D.P.R.1987) and in its June 7, 1989 *Opinion and Order* denying modification of the 55 square feet standard and January 10, 1991 *Memorandum Opinion and Order Denying Modification and Imposing Sanctions for Contempt.*[17]

Rule 60(b)(5) of the Federal Rules of Civil Procedure in relevant part permits the modification of judgments if "it is no longer equitable that the judgment should have prospective application." Although defendants have not stated in their pleadings the basis for their request for relief, the court assumes from their papers and oral argument that they are proceeding under Rule 60(b)(5).[18]

■ As a threshold matter, the judgment from which relief is sought must be "prospective" in nature. Although few courts have addressed the meaning of "prospective" relief, Justice Cardozo offered a definition in *United States v. Swift & Co.*, from which Rule 60(b) derives. "A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need.... The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and thus are provisional and tentative." 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932) (citations omitted). In *Twelve John Does v. District of Columbia*, furthermore, the D.C. Circuit invoked the *Swift* formulation in holding that an order dismissing a party from the action did not constitute a judgment with "prospective application" pursuant to Rule 6(b)(5); thus, in granting plaintiffs' motion to reinstate the defendant, the district court had abused its discretion.

> The order did not compel him to perform, or order him not to perform, any future act; it did not require the court to supervise any continuing interaction between him and the other parties to the case; rather, it definitively discharged [him] from any further involvement in the case.

841 F.2d 1133, 1139 (D.C.Cir.1988).

In the May 30, 1991 hearing on this matter, defendants informed the court that they were only seeking relief from fines accrued during the period beginning on October 23, 1990 and ending on June 15, 1991. Except for the 16–day period between May 30 and June 15, the fines from which defendants sought relief had already accrued at the time of the hearing.[19] With the exception of those sixteen days, then, the relief is sought from an order that is no longer executory and thus cannot be considered to have "prospective application."

Even assuming, however, that all the fines defendants seek to avoid satisfy the "prospective application" requirement, they would not be entitled to relief. As the court's September 14, 1987 opinion denying modification of the 35 square feet standard discussed, Rule 60(b)(5) permits modification of equitable decrees when, "after a sustained course of compliance ... changed circumstances make further application of the decree unjust." *Morales Feliciano v. Hernández Colón, supra*, 672

---

**17.** The court recognizes that its prior opinions addressed motions to modify a stipulated consent decree. The legal analysis set forth in those opinions, however, is equally relevant to the instant motion. *See generally* C. Wright and A. Miller, *Federal Practice and Procedure* secs. 2863–2864 (2d ed. 1987), which draws no distinction between modification of consent decrees and modification of other orders.

**18.** Rule 60(b)(6) constitutes a residual exception and allows modification for "any other reason justifying relief from the judgment." Courts frequently have not distinguished between the two subsection in discussing modification, and for all practical purposes this discussion pertains equally to both. *See, e.g., Duran v. Elrod*, 713 F.2d 292 (7th Cir.1983); *Mayberry v. Maroney*, 558 F.2d 1159 (3d Cir.1977).

**19.** Due to delays in the reporting of the inmate population counts and the Court Monitor's subsequent assessment of the fines, defendants had been ordered to pay only for those violations that had occurred up to January 23, 1991. The obligation to pay the fines, however, vests at the end of each day upon which a violation occurs.

F.Supp. at 632. The rule derives from the well-recognized power of courts of equity to modify judgments in the face of changed circumstances. Courts have relied traditionally on Justice Cardozo's formulation of the principle in *Swift*, which is particularly apropos here:

> The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making. We are not at liberty to reverse under the guise of readjusting. Life is never static, and the passing of a decade has brought changes.... The inquiry for us is whether the changes are so important that the dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off once the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. *Nothing less than a grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation....*

*United States v. Swift Co., supra,* 286 U.S. at 119, 52 S.Ct. at 465 (emphasis added). The First Circuit has long followed this standard. *See Fortin v. Commissioner of Massachusetts Dept. of Public Welfare,* 692 F.2d 790, 799 (1st Cir.1982).

Far from being "attenuated," the dangers faced by inmates afforded less than 35 square feet of living space remain as real and "substantial" today as they were when the contempt decree was issued in 1987. As the recent hearings and reports on Bayamón 1072, Miramar, and the State Penitentiary made painfully clear, crowding has contributed to the pervasive structural deterioration, to the shortage of food, utensils, and hygienic supplies, and to the lack of basic medical and psychiatric care from which inmates continue to suffer. These conditions are not mere shadows of things past; they remain a tangible and constant threat to AOC inmates and staff alike.[20]

Indeed, the "changed circumstances" upon which defendants base their motion derive entirely from their ongoing violation of this court's remedial orders. As outlined in Section III of the instant order, the preliminary injunction that closed admissions to Bayamón 1072 and the stipulated consent decree that closed admissions to Miramar arose out of the court's observations and from testimony pointing to clear violations of not only the crowding stipulation and the eighth amendment but also defendants' court-ordered environmental, medical, and mental health plans.

Confronted with dangers as manifest as those it observed at Bayamón 1072, the court would have been remiss had it not exercised its equitable remedial powers as it did in issuing the October 22 preliminary injunction. Reducing the contempt fines would in essence reward defendants for creating and perpetuating those dangers. As the Third Circuit noted in *Mayberry v. Maroney,* "The Commonwealth may not now artificially create its own 'changed circumstance....'" 558 F.2d 1159, 1163 (3d Cir.1977) (holding that district court abused its discretion in modifying consent decree closing section of state penitentiary).

Nor did the increase in population at the State Penitentiary and subsequent increase in fines that followed the closing of admissions at Bayamón 1072 and Miramar constitute "unforeseen conditions" warranting relief under the *Swift* standard. The defendants in this case are charged with the overall administration of the correctional system. After twelve years of litigation in this matter, they are well aware of their obligation to comport with the requirements of the eighth amendment and of the court's obligation to uphold it. The potential reverberations of future injunctions on the inmate population were evident at the time the court entered its contempt finding in July 1987, and were well within the

---

**20.** Rather than a "sustained course of compliance," the most recent monitor's report on crowding indicated that between January 10 and January 23, 1991, 4,499 prisoners were being held in institutions or housing units in violation of the 35 square feet standard. *See* 154th Report at 2.

court's view when it limited the fines to $300 per day in February 1991.[21] *See Duran v. Elrod*, 713 F.2d 292, 296 (7th Cir. 1983) (rise in jail population leading to violation of crowding decree did not constitute unforeseen conditions meriting relief from judgment).

Even under the evolving "flexible standard" for modification in institutional reform litigation, defendants are not entitled to relief. In *New York State Association for Retarded Children v. Carey*, 706 F.2d 956 (2nd Cir.1983), the district court, relying on *Swift*, had denied the defendants' motion to modify a consent decree in a manner that would further both the interests of the plaintiff class and the ultimate end of the litigation: the speedy closing of the squalid Willowbrook facility for the mentally retarded. The Court of Appeals reversed and remanded, noting,

> As experience with this type of litigation increases, a consensus is emerging among commentators in favor of modification with a rather free hand. According to one, the judge who declines to respond flexibly will fail to 'respond to the need, present in most institutional reform cases, for phased implementation and small alterations in strategic objectives as new knowledge is acquired.'

706 F.2d at 969, *quoting* Note, *Implementation Problems in Institutional Reform Litigation*, 91 Harv.L.Rev. 428, 436 (1977).

Courts that have adopted the *Carey* standard have been careful to determine whether the modification sought would further the objectives of the litigation. In *Kozlowski v. Coughlin*, 871 F.2d 241, 266–269 (2d Cir.1989), for example, the Court of Appeals affirmed the district court's refusal to modify a consent decree governing the suspension and termination of inmate contact visits, despite the defendant Commissioner of Corrections' contention that visitation was largely responsible for an increase in drug abuse in the prisons.

To alter the current equation, the Commissioner bears the burden of clearly showing that quantum of necessity needed to convince us of the need for action. This done, he must also show that each change prunes the decree deftly, changing only as much as is required and leaving the ability to obtain the ultimate goal intact.

871 F.2d 241, 248. *See Badgley v. Santa-Croce*, 853 F.2d 50, 54 (2d Cir.1988); *Ruiz v. Lynaugh*, 811 F.2d 856, 862 (5th Cir. 1987). *Cf. Thompson v. Enomoto*, 915 F.2d 1383, 1389 (9th Cir.1990) (district court granting of plaintiffs' motion for modification of consent decree regarding treatment for death row inmates affirmed; modification needed to effectuate primary goals of the decree).

Defendants in the instant case have not presented a scintilla of evidence to indicate that the sought-after relief from fines would further the singular objective of this litigation: the amelioration of unconstitutional conditions in Puerto Rico's prisons. In fact, they have offered no basis at all for their request other than their own continued violation of the consent decree, upon which the court's finding of contempt was grounded. Accordingly, the *Carey* standard is inapposite to the matter at hand.

Finally, defendants imply that the amount of the fines itself constitutes an inequity meriting modification. They aver that they would be "willing" to pay $1.2 million dollars per month and that this amount would continue to have a "coercive" impact.

It is axiomatic that if a contumacious party is "willing" to pay a certain amount in fines that the fines by definition are not coercive. *See United States v. City of Yonkers*, 856 F.2d 444, 460 (2d Cir.1988), *cert. granted in part*, 489 U.S. 1064, 109 S.Ct. 1337, 103 L.Ed.2d 808 (1989), *cert. denied in part*, 489 U.S. 1065, 109 S.Ct. 1339, 103 L.Ed.2d 810 (1989), *rev'd on other grounds sub nom. Spallone v. United States*, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) ("The need for a sub-

---

**21.** As defendants' pleadings correctly point out, the court exercised its discretion and reduced fines in light of truly unforeseen circumstances in 1989, when Hurricane Hugo forced the agency to house inmates at the State Penitentiary in excess of its capacity at 35 square feet. The distinction between that situation and the one at hand is self-evident.

stantial daily fine to coerce compliance is demonstrated by the City's announcement to the District Court of its willingness to pay $30 million....") Indeed, the willingness to pay in itself indicates that the party has made an economic (or, in this case, political) decision that it can afford to pay that amount in order to continue down the path of noncompliance. It is only when fines reach the point at which the party is no longer willing to pay, at which noncompliance has become *too* costly, that the true coercive impact is felt. That defendants in this case are seeking relief now, after nearly four years of paying fines, in itself indicates that the fines have at last achieved their coercive purpose.

The court is fully aware of the magnitude of the fines imposed in this case. Those fines, however, far fall short of the $1 million per day fine sanctioned by the Second Circuit in *United States v. City of Yonkers, supra,* 856 F.2d at 460. Substantial fines, moreover, are necessary to vindicate the court's authority and "secure compliance with and respect for the court's order." *United States v. Work Wear, supra,* 602 F.2d at 115. As the First Circuit noted in its September 26, 1989 affirmation of the August 15, 1988 order increasing fines, "the fine, though high, is lawful." *Morales Feliciano v. Hernández Colón,* 887 F.2d 1, 6 (1st Cir.1989).

In its opinion, the Court of Appeals pointed out that,

> since the purpose of the sanction in this case is to induce compliance with the court order, its reasonableness depends upon 'the character and magnitude of the harm threatened by the continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired.'

*Id.* at 6, *quoting United States v. United Mine Workers,* 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). As the situations at Bayamón 1072, Miramar, and the State Penitentiary make clear, the "character and magnitude of the harm threatened by [defendants'] continued contumacy" could not be greater. This court has twelve years of experience with that contu-

macy, and is firmly convinced of the need to continue sanctions at least at their current level if compliance with its orders is ever to be achieved.

WHEREFORE, it is hereby

ORDERED, that for the reasons set forth in this memorandum opinion, defendants' motion for partial and temporary relief from fines should be, and is, DENIED.

IT IS SO ORDERED.